**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| PBS BRAND CO., LLC, *et al.*[1] | Case No. 20-13157 (JKS) |
| Debtors. | (Jointly Administered) |

**SECOND MODIFIED FIRST AMENDED COMBINED DISCLOSURE STATEMENT
AND CHAPTER 11 PLAN OF LIQUIDATION OF PBS BRAND CO., LLC
AND AFFILIATED DEBTORS DATED MARCH 17, 2021**

| | |
|---|---|
| | Jeffrey R. Waxman (No. 4159) |
| | Eric J. Monzo (No. 5214) |
| | Brya M. Keilson (No. 4643) |
| | Sarah M. Ennis (No. 5745) |
| | Morris James LLP |
| | 500 Delaware Avenue, Suite 1500 |
| | Wilmington, DE 19801 |
| | Telephone: (302) 888-6800 |
| | Email: jwaxman@morrisjames.com |
| | Email: emonzo@morrisjames.com |
| | Email: bkeilson@morrisjames.com |
| | Email: sennis@morrisjames.com |
| | |
| | *Counsel to the Debtors and Debtors in Possession* |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are (1) PBS Brand Co., LLC, a Delaware limited liability company (7897), (2) Punch Bowl Social, Inc., a Delaware corporation (9826), (3) Punch Bowl Arlington, LLC, a Delaware limited liability company (7250), (4) Punch Bowl Atlanta Battery, LLC, a Delaware limited liability company (8973), (5) Punch Bowl Austin, LLC, a Delaware limited liability company (0366), (6) Punch Bowl Chicago West Loop, LLC, a Delaware limited liability company (4024), (7) Punch Bowl Cleveland, LLC, a Delaware limited liability company (8583), (8) Punch Bowl Dallas Deep Ellum, LLC, a Delaware limited liability company (8239), (9) Punch Bowl, LLC, a Colorado limited liability company (2287), (10) Punch Bowl Indianapolis, LLC, a Delaware limited liability company (0144), (11) Punch Bowl Minneapolis, LLC, a Delaware limited liability company (9815), (12) Punch Bowl Sacramento, LLC, a Delaware limited liability company (8092), (13) Punch Bowl SanDiego, LLC, a Delaware limited liability company (6440), (14) Punch Bowl Austin Congress, LLC a Delaware limited liability company (0964), and (15) Punch Bowl Ranchocucamonga, LLC, a Delaware limited liability company (6646).

1

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................7

**ARTICLE I. DEFINITION AND CONSTRUCTION OF TERMS** ..........................8

**ARTICLE II. BACKGROUND** ..............................................................................24

    **2.01  GENERAL BACKGROUND** .........................................................24

    **2.02  THE DEBTORS' BANKRUPTCY FILING** .....................................23

    **2.03  THE DEBTORS' PREPETITION MARKETING PROCESS, THE POSTPETITION RETENTION OF SSG ADVISORS, LLC, THE MOTION TO ESTABLISH BIDDING PROCEDURES** ....................31

    **2.04  THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**....32

    **2.05  SALE OF BRANDCO'S INTEREST IN NONDEBTOR AFFILIATES** .......33

    **2.06  SCHEDULES AND STATEMENTS OF FINANCIAL AFFAIRS AND BAR DATE MOTION** ....................................................34

**ARTICLE III. CONFIRMATION PROCEDURES** ................................................39

    **3.01  CONFIRMATION PROCEDURES** ...............................................39

    **3.02  PROCEDURE FOR OBJECTIONS** ................................................39

    **3.03  REQUIREMENTS FOR CONFIRMATION**....................................40

    **3.04  CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS**..................40

    **3.05  IMPAIRED CLAIMS OR EQUITY INTERESTS**...........................41

    **3.06  CONFIRMATION WITHOUT NECESSARY ACCEPTANCES; CRAMDOWN** ............................................................42

    **3.07  FEASIBILITY** ..........................................................................43

    **3.08  BEST INTERESTS TEST AND LIQUIDATION ANALYSIS** ......................43

    **3.09  ACCEPTANCE OF THE PLAN** .....................................................44

**ARTICLE IV. CLASSIFICATION OF CLAIMS AND INTERESTS AND EXPECTED RECOVERIES** .................................................................45

    **4.01  OVERVIEW OF CLASSIFICATION.** ............................................45

    **4.02  IDENTIFICATION AND TREATMENT OF UNCLASSIFIED CLAIMS** ..45

**4.03**    **IDENTIFICATION OF CLASSES OF CLAIMS** ............................47

**4.04**    **TREATMENT OF CLASSIFIED CLASSES, RIGHTS TO VOTE, AND ESTIMATED DISTRIBUTIONS**.............................................49

**4.05**    **ELIMINATION OF CLASSES FOR VOTING PURPOSES** .......................53

**4.06**    **CONTROVERSY CONCERNING CLASSIFICATION, IMPAIRMENT OR VOTING RIGHTS**.........................................................54

**4.07**    **INSURANCE** .........................................................................54

**ARTICLE V. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING** ......................................................................................54

**5.01**    **THE PLAN MAY NOT BE ACCEPTED**.........................................54

**5.02**    **THE PLAN MAY NOT BE CONFIRMED**.......................................55

**5.03**    **NONCONSENSUAL CONFIRMATION**..........................................55

**5.04**    **DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN MAY BE INCONSISTENT WITH PROJECTIONS**...........................55

**5.05**    **OBJECTIONS TO CLASSIFICATION OF CLAIMS.** ...................................55

**5.06**    **FAILURE TO CONSUMMATE THE PLAN.**..................................56

**5.07**    **ALLOWANCE OF CLAIMS MAY SUBSTANTIALLY DILUTE THE RECOVERY TO HOLDERS OF CLAIMS UNDER THE PLAN.** ................56

**5.08**    **FAILURE TO IDENTIFY LITIGATION CLAIMS OR PROJECTED OBJECTIONS.**.......................................................................57

**5.09**    **PLAN RELEASES MAY NOT BE APPROVED.**..............................57

**5.10**    **CERTAIN TAX CONSIDERATIONS.** ............................................57

**ARTICLE VI. MEANS FOR IMPLEMENTATION OF THE PLAN** ...................57

**6.01**    **CONTINUED CORPORATE EXISTENCE** ....................................57

**6.02**    **PLAN ADMINISTRATOR**......................................................59

**6.03**    **CAUSES OF ACTION** ............................................................61

**6.04**    **RELEASE OF LIENS** ............................................................61

ii

**6.05    VESTING AND SALE OR OTHER DISPOSITION OF ASSETS; REPRESENTATIVE OF THE ESTATE** ......................................62

**6.06    EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS** .............62

**6.07    DEEMED SUBSTANTIVE CONSOLIDATION** .............................62

**6.08    RECORDS** ............................................................................63

**6.09    INSURANCE POLICIES** ........................................................64

**6.10    DISSOLUTION OF CREDITORS' COMMITTEE** ........................64

**6.11    REQUEST FOR EXPEDITED DETERMINATION OF TAXES** ...............64

**6.12    TRANSFER OF PRIVILEGE/NO WAIVER** ................................64

**6.13    TERMINATION OF THE CLAIMS AGENT** ................................64

**ARTICLE VII. EXECUTORY CONTRACTS** ........................................65

**7.01    ASSUMPTION OF EXECUTORY CONTRACT(S)** .........................65

**7.02    REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...........................................................................65

**7.03    BAR DATE FOR REJECTION DAMAGES** ................................66

**7.04    PRE-EXISTING OBLIGATIONS TO THE DEBTORS UNDER EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ..................66

**ARTICLE VIII. PROVISIONS GOVERNING RESOLUTION OF  CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN** ..................66

**8.01    CLAIM OBJECTIONS** ............................................................66

**8.02    DISTRIBUTION PROVISIONS** ................................................67

**ARTICLE IX. RELEASES, INJUNCTION, AND RELATED PROVISIONS** ..................71

**9.01    COMPROMISE AND SETTLEMENT OF CLAIMS, INTERESTS, AND CONTROVERSIES** ................................................................71

**9.02    RELEASES BY DEBTORS** ......................................................71

**9.03    RELEASES BY THIRD PARTIES** ............................................71

**9.04    EXCULPATION AND LIMITATION OF LIABILITY** ..................72

iii

**9.05    INJUNCTION** ....................................................................................73

**9.06    LIMITED INJUNCTION** .....................................................................74

**ARTICLE X. CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE** ..............74

**10.01    CONDITIONS PRECEDENT TO CONFIRMATION** ..................................74

**10.02    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ........................75

**10.03    WAIVER OF CONDITIONS** ................................................................75

**10.04    EFFECT OF FAILURE OF CONDITIONS** ..............................................75

**10.05    FILING OF NOTICE OF THE EFFECTIVE DATE.** ................................76

**ARTICLE XI. MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN** .........76

**11.01    MODIFICATION AND AMENDMENTS** ................................................76

**11.02    EFFECT OF CONFIRMATION ON MODIFICATIONS** ...........................76

**11.03    REVOCATION OR WITHDRAWAL OF THE PLAN** ................................76

**ARTICLE XII. JURISDICTION** .........................................................................77

**12.01    BANKRUPTCY COURT JURISDICTION** ...........................................77

**12.02    LIMITATION ON JURISDICTION** .....................................................78

**ARTICLE XIII. MISCELLANEOUS** ...................................................................79

**13.01    EXEMPTION FROM TAXES** ..............................................................79

**13.02    COMPLIANCE WITH TAX REQUIREMENTS** .....................................79

**13.03    DEFENSES AND SETOFF** .................................................................80

**13.04    GOVERNING LAW** ..........................................................................80

**13.05    SUCCESSORS AND ASSIGNS** ...........................................................80

**13.06    TRANSFER OF CLAIMS AND EQUITY INTERESTS** ...........................80

**13.07    POST-EFFECTIVE DATE SERVICE LIST** ..........................................80

**13.08    NOTICES** .......................................................................................81

**13.09    IMMEDIATE BINDING EFFECT** ......................................................82

iv

**13.10  SEVERABILITY OF PLAN PROVISIONS** ......................................................82

**13.11  EXHIBITS** .................................................................................................82

**13.12  VOTES SOLICITED IN GOOD FAITH** .........................................................82

**13.13  CONFLICTS** ..............................................................................................83

**13.14  U.S. TRUSTEE FEES** ................................................................................83

**13.15  IMPLEMENTATION** ...................................................................................83

**13.16  NO ADMISSIONS** ......................................................................................83

12844563.v1

## **DISCLAIMER**

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUES OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS

THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE V OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## **INTRODUCTION**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby jointly propose this Combined Plan and Disclosure Statement pursuant to sections 1125 and 1129 of the Bankruptcy Code.

This Combined Plan and Disclosure Statement contemplates the fulfillment and consummation of a number of transactions and commitments evidenced in part by a Restructuring Support Agreement by and among the Debtors, the Committee, and the Prepetition Secured Lender and DIP Lender, a copy of which was filed with the Court on January 25, 2021 [Docket No. 181],[2] pursuant to which, among other things, the Prepetition Secured Lender will (i) remit payment of Allowed Administrative and Priority Claims, and (ii) fund a trust for the liquidation of the Estates' remaining assets, including pursuing certain Causes of Action. Further, the GUC Trust will review certain General Unsecured Claims, and make Distributions on account of Allowed General Unsecured Claims. The Combined Plan and Disclosure Statement also contemplates the appointment of a Plan Administrator to, among other things, finalize the wind down of the Debtors' affairs, liquidate certain of the remaining assets of the Debtors, resolve Disputed Claims (other than Disputed General Unsecured Claims), implement the terms of the Plan and make Distributions to holders of Allowed Claims other than holders of Allowed General Unsecured Claims.

This Combined Disclosure Statement and Plan contains, among other things, (i) a discussion of the Debtors' history and businesses, (ii) a summary of the events leading to these Chapter 11 Cases, (iii) the Chapter 11 Cases, (iv) risk factors, (v) a summary and analysis of this Plan, and (vi) certain other related matters.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

---

[2]    All references to "Docket No. __" refer to pleadings filed in the Chapter 11 Cases. Copies of all pleadings are available at the Bankruptcy Court's website, https://ecf.deb.uscourts.gov/, for a fee or through the Debtors' website, https://omniagentsolutions.com/pbs, for free.

# ARTICLE I.

## DEFINITION AND CONSTRUCTION OF TERMS

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, (i) any capitalized term used in this Combined Disclosure Statement and Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable, (ii) whenever the context requires, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter, (iii) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (iv) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (v) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan, (vi) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to any particular paragraph, subparagraph, or clause contained in the Plan, (vii) captions and headings to articles and sections are inserted for convenience of reference only and shall not limit or otherwise affect the provisions hereof or the interpretation of the Plan, and (viii) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

As used in the Plan, the following terms have the following meanings:

1.1.    "**503(b)(9) Claims**" shall mean Claims arising under section 503(b)(9) of the Bankruptcy Code against one or more of the Debtors Filed against one or more of the Debtors on or before the General Bar Date.

1.2.    "**Acquired Causes of Action**" shall mean (i) any Cause of Action against Ongoing Trade Vendors that continue to do business with the Purchaser after the Closing Date and (ii) any Cause of Action, right, and/or defense with respect to the liens of Phoenix Millworks, Inc.

1.3.    "**Administrative Claim**" shall mean any right to payment constituting a cost or expense of administration of the Chapter 11 Case as it relates to one of the Debtors under section 503(b) and 507(a)(2) of the Bankruptcy Code including, any actual and necessary costs and expenses of preserving the Debtors' Estates, any actual and necessary costs and expenses of operating the Debtors' business, any indebtedness or obligations incurred by the Debtors after the Petition Date in connection with the conduct of its business, all compensation and reimbursement of expenses awarded or otherwise approved for payment by Final Order of the Bankruptcy Court under section 330, 503(b) or 1129(a)(4) of the Bankruptcy Code, any fees or charges assessed against the Debtors' Estates under section 1930 of chapter 123 of title 28 of the United States Code, all wages, salaries and health and other benefits on account of services rendered after the Petition Date, all post-Petition Date taxes, and all other claims entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court, in each case relating to the period from the Petition Date to the Effective Date but not beyond.

1.4.     "**Administrative Claim Bar Date**" means the date that is no later than 30 (thirty) days after the Effective Date, which shall be the deadline for Filing requests for payment of Administrative Claims that arose before the Effective Date.

1.5.     "**Affiliate**" shall mean "affiliate" as such term is defined in section 101(2) of the Bankruptcy Code.

1.6.     "**Allowance Date**" means the date that a Claim or Equity Interest becomes Allowed.

1.7.     "**Allowed**" shall mean all or a portion of a Claim against one of the Debtors or an Interest in the Debtors (a) that has been listed by one of the Debtors in its Schedules as liquidated in amount and not "disputed" or "contingent," and with respect to which no contrary Claim or proof of Interest has been Filed, (b) as to which no Objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court provided that prior to expiration of the Claims Objection Deadline, the GUC Trustee may file a notice on the docket as to any claim or claims, stating that no objection will be filed to such claims in which case such claim or claims shall also become "Allowed," (c) as to which any Objection has been settled, waived, withdrawn or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest and one or more of the Debtors prior to the Effective Date, or the GUC Trustee on behalf of the Debtors' Estates after the Effective Date or (iii) pursuant to the terms of this Plan. For purposes of computing Distributions under this Plan, a Claim or Interest that has been deemed "Allowed" shall not include interest, costs, fees or charges on such Claim or Interest from and after the Petition Date, except as provided in section 506(b) of the Bankruptcy Code or as otherwise expressly set forth in this Plan. For the avoidance of doubt, any Claim that relates to obligations that were assumed by the Purchaser pursuant to the Purchase Agreement or the commitment of the Supporting Lender pursuant to the RSA, shall not be an Allowed Claim for purposes of this Plan.

1.8.     "**Asset Purchase Agreement**" or "**APA**" shall mean that certain asset purchase agreement by and between the Debtors and the Purchaser dated as of March 15, 2021, including all amendments, schedules and exhibits thereto.

1.9.     "**Assets**" means all tangible and intangible assets of every kind and nature of the Debtors and their Estates within the meaning of section 541 of the Bankruptcy Code.

1.10.     "**Assigned Contracts**" shall mean Debtors' executory contracts and unexpired leases to be assumed and assigned in connection with the Sale.

1.11.     "**Associated Entities**" means with respect to any Person or Entity, such Person's or Entity's Affiliates, current and former officers, managers, members, directors, shareholders, partners, general partners, limited partners, managed accounts and funds, predecessors, successors and assigns, and each of their (or such person's) respective professionals, advisors, accountants, attorneys, financial advisors, investment bankers, consultants, employees, principals, members, shareholders, partners, limited partners, general partners, agents, and other representatives, each solely in its capacity as such.  Notwithstanding the foregoing, the Associated Entities shall not

include (i) Robert Thompson, (ii) Cracker Barrel Old Country Store, Inc., (iii) Sortis, or (iv) the affiliates of any of (i) through (iii).

1.12.    "**Bankruptcy Code**" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to these Chapter 11 Cases.

1.13.    "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of Delaware.

1.14.    "**Bankruptcy Rules**" shall mean, when referenced generally, (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code, (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code, (iii) the applicable Local Rules of Bankruptcy Practice and Procedures for the United States Bankruptcy Court for the District of Delaware, and (iv) any standing orders governing practice and procedure issues by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 case or proceedings therein, as the case may be; provided, however, when a specific Bankruptcy Rule is referenced (*e.g.,* Bankruptcy Rule 9019), such reference shall be to such Rule under the Federal Rules of Bankruptcy Procedure.

1.15.    "**Bar Date**" shall mean, with respect to any particular Claim, April 5, 2021, the specific date set by the Bankruptcy Court as the last day for Filing proofs of Claim or proofs of Interest against one or more of the Debtors in the Chapter 11 Cases for that specific Claim or Interest.

1.16.    "**Bar Date Order**" shall mean the Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof entered by the Bankruptcy Court on March 12, 2021 [Docket No.  398].

1.17.    "**Business**" shall mean the operation of food, beverage and social gaming retail establishments doing business as Punch Bowl Social conducted by Sellers.

1.18.    "**Business Day**" shall mean any day, other than a Saturday, Sunday or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

1.19.     "**Cash**" or "**$**" shall mean legal tender of the United States of America or the equivalent thereof, including bank deposits, checks and cash equivalents.

1.20.    "**Cause(s) of Action**" shall mean any and all actions, suits, claims for relief, causes of action, including but not limited to claims arising under chapter 5 of the Bankruptcy Code, commercial tort claims and other commercial claims including insurance proceeds, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise,

12844563.v1

whether arising prior to or after the Petition Date, except to the extent that they: (i) relate to or arise from ongoing trade claims of Ongoing Trade Vendors, or (ii) are released pursuant to the Plan. For the avoidance of doubt, Released Causes of Action and Acquired Causes of Action are not included herein as a "Cause of Action".

1.21.    "**Chapter 11 Cases**" shall mean the Debtors' chapter 11 cases, which are jointly administered under Case No. 20-13157 (JKS) in the Bankruptcy Court.

1.22.    "**Claim**" or "**Claims**" shall mean a claim or claims against one or more of the Debtors, as such term is defined in section 101(5) of the Bankruptcy Code.

1.23.    "**Claims Agent,**" "**Noticing Agent,**" and "**Balloting Agent**" shall each mean Omni Agent Solutions or any successor appointed by the Bankruptcy Court or retained by the GUC Trustee after the Effective Date.

1.24.    "**Claims Objection Deadline**" shall mean one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court, *provided however*, that the GUC Trustee, with respect to General Unsecured Claims, and the Plan Administrator, with respect to Claims other than General Unsecured Claims, may file one or more motions with the Bankruptcy Court on notice and an opportunity for a hearing to extend such deadline from time to time.

1.25.    "**Class**" shall mean each category or group of Holders of Claims or Interests that has been designated as a class in Article IV of this Plan.

1.26.    "**Combined Disclosure Statement and Plan**" or "**Plan**" shall mean this entire document and all exhibits, schedules and related documents, whether annexed hereto or Filed in connection herewith, including the Disclosure Statement portions and the Plan portions.

1.27.    "**Confirmation Date**" shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

1.28.    "**Confirmation Hearing**" shall mean the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.29.    "**Confirmation Order**" shall mean the order of the Bankruptcy Court confirming this Plan pursuant to, among others, section 1129 of the Bankruptcy Code, in a form and substance reasonable acceptable to CrowdOut and the Committee and consistent with the terms of the RSA.

1.30.    "**Consummation**" shall mean the occurrence of the Effective Date.

1.31.    "**Contingent**" shall mean, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

1.32.    "**Convenience Claim**" means any Claim against the Debtors that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date, where the total amount of the Claim is equal to or less than $2,500, and that is not: (i) an Administrative Expense Claim, (ii) a Priority Tax Claim, (iii) a Secured Claim, (iv) a Priority Non-Tax Claim, or (v) an Intercompany Claim.   Holders of multiple Claims that are not (i) an Administrative Expense Claim, (ii) a Priority Tax Claim, (iii) a Secured Claim, (iv) a Priority Non-Tax Claim, or (v) an Intercompany Claim, shall be aggregated and treated as a single Class 5 General Unsecured Claim, and will not be treated as a Convenience Class Claim unless the Holder of such claim makes an election as set forth in Section 4.03(d) herein.

1.33.    "**Creditor**" shall have the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

1.34.    "**Creditors' Committee**" or the "**Committee**" shall mean the official committee of unsecured creditors appointed by the U.S. Trustee.

1.35.    "**CrowdOut**" or "**DIP Lender**" or "**Prepetition Secured Lender**," or "**Supporting Lender**" shall mean CrowdOut Capital LLC.

1.36.    "**Debtors**" shall mean PBS Brand Co., LLC, a Delaware limited liability company, Punch Bowl Social, Inc., a Delaware corporation, Punch Bowl Arlington, LLC, a Delaware limited liability company, Punch Bowl Atlanta Battery, LLC, a Delaware limited liability company, Punch Bowl Austin, LLC, a Delaware limited liability company, Punch Bowl Chicago West Loop, LLC, a Delaware limited liability company, Punch Bowl Cleveland, LLC, a Delaware limited liability company, Punch Bowl Dallas Deep Ellum, LLC, a Delaware limited liability company, Punch Bowl, LLC, a Colorado limited liability company, Punch Bowl Indianapolis, LLC, a Delaware limited liability company, Punch Bowl Minneapolis, LLC, a Delaware limited liability company, Punch Bowl Sacramento, LLC, a Delaware limited liability company, Punch Bowl San Diego, LLC., Punch Bowl Austin Congress, LLC a Delaware limited liability company, and Punch Bowl Ranchocucamonga, LLC, a Delaware limited liability company.

1.37.    "**Designation List**" shall mean the Purchaser's list of items, including contracts or leases, that are not assumed or rejected on the Closing Date, and are subject to the Purchaser's Designation Rights.

1.38.    "**Designation Rights**" shall mean the right of the Purchaser to designate certain contracts or leases on the Designation List, pursuant to the terms of the APA, for assumption or rejection, which shall occur no later than twenty-one (21) days following the Closing Date, with Purchaser responsible to pay for any post-Closing Date obligations under any contract or lease on the Designation List and the Rejected Leases Funding charge of 20% under the Restructuring Support Agreement for any Real Property Leases on the Designation List that become rejected leases.

1.39.    "**DIP Claims**" shall mean any and all Claims in respect of the DIP Obligations (as defined in the Final DIP Order), including all interest, premiums, fees, costs, expenses, indemnification, and other amounts owing under the DIP Documents and in accordance therewith, held by, or otherwise owing to, any or all of the DIP Lender.

1.40.    "**DIP Documents**" shall mean the "DIP Documents" as defined in the Final DIP Order.

1.41.    "**Disallowed**" shall mean with respect to any Claim or Interest or portion thereof, any Claim against or Interest in one or more of the Debtors which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn by agreement of the Holder thereof and the Debtors or the GUC Trustee, whole or in part; (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as Disputed, Contingent or unliquidated and in respect of which a proof of Claim or a proof of Interest, as applicable, has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim or proof of Interest; (vi) is evidenced by a proof of Claim or a proof of Interest which has been Filed, or which has been deemed to be Filed under applicable law or order of the Bankruptcy Court or which is required to be Filed by order of the Bankruptcy Court but as to which such proof of Claim or proof of Interest was not timely or properly Filed; (vii) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; and (viii) where the Holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code. In each case a Disallowed Claim or a Disallowed Interest is Disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

1.42.    "**Disallowed Claim**" shall mean a Claim, or any portion thereof, that is Disallowed.

1.43.    "**Disallowed Interest**" shall mean an Interest, or any portion thereof, that is Disallowed.

1.44.    "**Disbursing Agent**" shall mean, for each Class, the party designated herein to make distributions.

1.45.    "**Disclosure Statement**" shall mean the disclosure statement, as amended, supplemented or modified from time to time, that is embodied within this Combined Disclosure Statement and Plan and distributed in accordance with, among others, sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable law.

1.46.    "**Disputed**" shall mean any Claim or Interest which has not yet been Allowed or Disallowed in accordance with the terms of this Plan.

1.47.    "**Disputed Administrative Claim, Priority Tax Claim, Priority Non-Tax Claims and Secured Claims Reserves**" shall mean the reserves established pursuant to Section 8.02 of this Plan, which reserve shall contain amounts relating to Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims.

1.48.    "**Disputed Convenience Claims Reserve**" shall mean the reserves established pursuant to Section 8.02 of this Plan, which reserve shall contain amounts relating to Disputed Convenience Claims.

1.49.    "**Distribution**" shall mean any distribution made pursuant to the Plan by the Entity acting as the Disbursing Agent to the Holders of Allowed Claims in a particular Class.

1.50.    "**Distribution Date**" shall mean the date on which a Distribution is made pursuant to this Plan.

1.51.    "**Distribution Record Date**" shall mean the date established for determining the Holders of Allowed Claims or Allowed Interests entitled to receive a Distribution pursuant to the Plan.  The Distribution Record Date shall be the Confirmation Date.

1.52.    "**Effective Date**" shall mean the first Business Day after the later of the date on which (a) all conditions in Article X of this Plan have been satisfied or waived in accordance with that Article and (b) no stay of the Confirmation Order is in effect.

1.53.    "**Entity**" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.54.    "**Estate**" or "**Estates**" shall mean one or more estate of the Debtors created pursuant to section 541 of the Bankruptcy Code.

1.55.    "**Exculpated Parties**" shall mean as of the Petition Date through the date of the closing of the Chapter 11 Cases (and in the event that the Chapter 11 Cases are closed and subsequently reopened, during such time as the Chapter 11 Cases are reopened): (i) the Debtors, (ii) the Debtors' directors and officers, (iii) the Creditors' Committee, and (iv) in the case of (i) – (iii) each of their respective Representatives, and in the case of the Creditors' Committee, each of its members (each solely in such capacity); *provided, however,* that with respect to any Person identified herein, such Person shall be considered an Exculpated Party solely to the extent that such Person participated in actions to which section 1125(e) of the Bankruptcy Code applies.

1.56.    "**Executory Contract**" shall mean a contract or lease to which one of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.57.    "**File**," "**Filed**," or "**Filing**" shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in this Chapter 11 Case; provided, however, that with respect to proofs of Claim and proofs of Interest only, "Filed" shall mean delivered and received in the manner provided by the Bar Date Order or as otherwise established by order of the Bankruptcy Court.

1.58.    "**Final DIP Agreement**" the underlying secured credit agreement between the Debtors and the Purchaser, including the Restructuring Support Agreement, approved by the Bankruptcy Court on a final basis on February 4, 2021 [Docket No. 250].

1.59.    "**Final DIP Credit Facility**" shall mean the post-petition loan facility provided pursuant to the Senior Secured Super Priority Debtor-In-Possession Credit Agreement attached as Exhibit A of the Final DIP Order.

1.60.    "**Final DIP Motion**" shall mean the Debtors' Motion for Final Order Pursuant to 11 U.S.C. §§ 105 361, 362, 363, 364, 503, and 507 (I) authorizing The Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral and Granting Adequate Protection; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief [Docket No. 181].

1.61.    "**Final DIP Order**" shall mean the Order approving the Final DIP Motion [Docket No 250].

1.62.    "**Final Order**" shall mean an unstayed order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or request for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtors, the Purchaser, the Committee, the Plan Administrator, or the GUC Trustee (as applicable), or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under rule 59 or rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

1.63.    "**General Unsecured Claim**" shall mean any unsecured Claim against the Debtors that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date and that is not: (i) an Administrative Expense Claim, (ii) a Priority Tax Claim, (iii) a Secured Claim, (iv) a Priority Non-Tax Claim, (v) a Convenience Claim, or (vi) an Intercompany Claim.

1.64.    "**Governmental Unit**" shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.65.    "**Governmental Unit Bar Date**" shall mean June 29, 2021 as established by the Bar Date Order.

1.66.    "**GUC Trust**" shall mean the trust established under the Plan and the GUC Trust Agreement.

12844563.v1

1.67.   **"GUC Trust Amounts"** means (a) the GUC Trust Distributable Cash, (b) the GUC Trust Participation Funding, (c) the Liquor License Funding; (d) the Ongoing Trade Claim Surplus, if any, and (e) the Rejected Leases Funding, if any.[3]

1.68.   **"GUC Trust Assets"** means (a) the GUC Trust Amounts, (b) GUC Trust Litigation Claims, (c) all of the Sellers' interest in any Equity Securities of any non-debtor Subsidiary or Affiliate (including any PSS Entity) that Buyer does not elect to include in Purchased Assets, (d) all proceeds of the foregoing, and (e) one percent (1%) of the Intercompany Interests solely for the purpose of conferring standing upon the GUC Trustee to institute GUC Trust Litigation Claims pursuant to the provisions of the Delaware Limited Liability Company Act (the "LLC Act"), and (f) any Records relating to the foregoing.

1.69.   **"GUC Trust Distributable Cash"** shall mean cash from the Supporting Lender in the amount of $500,000, which will be funded to the GUC Trust on the Effective Date and shall be part of the GUC Trust Assets.

1.70.   **"GUC Trust Participation Funding"** shall mean cash from the Supporting Lender in the amount of $500,000 for GUC Trust administration and litigation funding, which will be funded to the GUC Trust on the Effective Date and shall be part of the GUC Trust Assets.

1.71.   **"GUC Trustee"** shall mean the Person appointed pursuant this Plan to serve as the trustee of the GUC Trust for the purposes of, among other things, liquidating the GUC Trust Assets following the Effective Date. Amanda Demby of Province, LLC has been selected as the GUC Trustee by the Creditors' Committee in accordance with the Creditors' Committee bylaws with the consent of the Debtors.

1.72.   **"GUC Trust Agreement"** means the trust agreement that establishes the GUC Trust and governs the powers, duties, and responsibilities of the GUC Trustee.  The GUC Trust Agreement shall be part of the Plan Supplement.

1.73.   **"GUC Trust Expenses"** shall mean the reasonable fees, costs and expenses of the GUC Trusts' retained professionals, as determined in the reasonable discretion of the GUC Trustee.

1.74.   **"GUC Trust Litigation Claims"** means all Causes of Action, other than, for the avoidance of doubt (i) those Released Causes of Action and (ii) Acquired Causes of Action

1.75.   **"Holder"** or **"Holders"** shall mean the legal or beneficial Holder of a Claim or Interest (and, when used in conjunction with a Class or type of Claim or Interest, means a Holder of a Claim or Interest in such Class or of such type).

1.76.   **"Impaired"** shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

---

[3]   In the case of part (c) and (d), the Supporting Lender agrees to use commercially reasonable efforts to sell such liquor licenses within one (1) year of the closing of any Sale or, as applicable, the Effective Date of any Plan whereby the Supporting Lender is the Successful Bidder or plan proponent, as applicable.

12844563.v1

1.77.    "**Impaired Class**" shall mean a Class of Claims or Interests that is Impaired.

1.78.    "**Insider**" shall have the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

1.79.    "**Internal Revenue Code**" shall mean the United States Internal Revenue Code of 1986, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

1.80.    "**Intercompany Interests**" shall mean all Interests of any Debtor in any other Debtor, excluding Interests held by Punch Bowl Social, Inc. in PBS Brand Co., LLC.

1.81.    "**Intercompany Claim**" shall mean (i) any account reflecting intercompany book entries by one Debtor with respect to another Debtor, or (ii) any Claim that is not reflected in such book entries and is held by a Debtor against the other Debtor, in each case accruing before or after the Petition Date through the Effective Date, including, but not limited to, any Claim for reimbursement, payment as guarantor or surety, or any Claim for contribution or expenses that were allocable between the one or more of the Debtors.

1.82.    "**Interests**" shall mean the legal interests, equitable interests, contractual interests, equity interests or ownership interests, or other rights of any Person in the Debtors including all capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtor, partnership interests in the Debtors' stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests or other shares of capital stock of the Debtors or obligating the Debtors to issue, transfer or sell any shares of capital stock whether or not certificated, transferable, voting or denominated "stock" or a similar security.

1.83.    "**IRS**" shall mean the Internal Revenue Service.

1.84.    "**Lien**" shall mean any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

1.85.    "**Liquor License Funding**" shall mean (i) cash from the Supporting Lender in an amount equal to 50% (fifty percent) of the net proceeds (after deducting all Taxes and all costs and expenses incurred or paid in connection with such sale) realized from the sale of any liquor licenses sold by the Secured Lender within two (2) years after the Closing Date for any PBS Location where the Real Property Lease was terminated or the Purchaser has determined, in its sole discretion, not to assume the Real Property Lease for that PBS Location, and (ii) cash from the Supporting Lender in an amount equal to 50% (fifty percent) of the net proceeds (after deducting all Taxes and all costs and expenses incurred or paid in connection with such sale) realized from the sale of any liquor

17

licenses sold within two (2) years after the Closing Date, in each case held by any Person that (a) is an Affiliate of BrandCo, (b) is not a debtor in the Chapter 11 Cases, and (c) is an obligor under the Loan Agreement or the Final DIP Credit Facility, which will be funded to the GUC Trust within ten (10) days of the Supporting Lender's receipt of such funds, and shall be part of the GUC Trust Assets.

1.86.    "**Loan Agreement**" shall mean the Loan Agreement dated as of May 31, 2018 between CrowdOut, as lender, and Brand Co, as borrower, as amended by (i) that certain First Amendment to Loan Agreement, dated as of September 7, 2018, between Brand Co and CrowdOut, (ii) that certain Second Amendment to Loan Agreement, dated as of May 1, 2019, between Brand Co and CrowdOut, whereby CrowdOut partially assigned its interests in the Loan to certain other secured parties as set forth in the Second Amendment (collectively with CrowdOut, the "Secured Parties"), and (iii) that certain Third Amendment to Loan Agreement, dated July 18, 2019, between the Secured Parties, Brand Co, and together with certain other documents, instruments and agreements executed pursuant thereto or in connection therewith, the "Loan Documents")

1.87.    "**Local Rules**" shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.88.    "**Objection(s)**" shall mean any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

1.89.    "**Ongoing Trade Claim Surplus**" shall mean any unused portion of $500,000 from the Supporting Lender to satisfy claims of trade creditors with which the Supporting Lender or its designee intends to have an ongoing business relationship, which will be contributed to the GUC Trust within 10 (ten) days of a determination by the Supporting Lender that it will not use such funds to satisfy any further claims of trade creditors, and shall be part of the GUC Trust Assets.

1.90.    "**Ongoing Trade Vendors**" shall mean vendors that did business with the Debtors prior to the Closing Date, and continue to do business with the Purchaser after the Closing Date.

1.91.    "**Ordinary Course Liabilities**" shall mean those liabilities incurred by the Debtors after the Petition Date in the ordinary course of business.

1.92.    "**PBS Interests**" shall mean all equity interests in PBS HoldCo, LLC, a non-debtor.

1.93.    "**PBS Locations**" shall mean each of the locations at which Sellers or their Affiliates operate facilities offering food, beverage or entertainment or otherwise use to conduct the business, as set forth in the PBS Location Schedule to the APA.

1.94.    "**Person**" shall have the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

1.95.    "**Petition Date**" shall mean December 21, 2020 or December 31, 2020, the date on which the respective Debtors commenced the Chapter 11 Cases in the Bankruptcy Court.

12844563.v1

1.96.   "**Plan**" shall mean this plan of liquidation under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified or supplemented from time to time including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

1.97.   "**Plan Administrator**" shall mean the Person designated by the Supporting Lender, in its sole discretion, for such position in the Plan Supplement or such other Person appointed in accordance with Section 6.02 of the Plan, acting pursuant to the authority granted under Section 6.02 of the Plan.

1.98.   "**Plan Administrator Agreement**" the agreement substantially in the form filed in the Plan Supplement establishing and appointing the Plan Administrator.

1.99.   "**Plan Administrator Expenses**" shall mean any and all reasonable fees, costs, and expenses incurred by the Plan Administrator (or any Person engaged by the Plan Administrator to effect Distributions or otherwise assist the Plan Administrator with its duties under the Plan) funded by the Supporting Lender in connection with any of its duties under the Plan, including (i) any administrative fees; (ii) attorneys' or other professionals' fees and expenses of the Plan Administrator; (iii) insurance fees; (iv) taxes; (v) escrow expenses; (vi) fees payable under 28 U.S.C. § 1930 to the extent related to Plan Administrator disbursements, if any (with the exception of such fees (a) incurred prior to the Effective Date which will be paid by the Debtors on the Effective Date; (vii) costs associated with any maintenance, liquidation, and administration of any going concern as part of the wind down of the Debtors' business operations; (viii) costs to maintain Assets while they are held for sale or otherwise liquidated; and (ix) fees incurred in connection with the making of Distributions on account of Allowed Claims that are determined to be the obligation of the Plan Administrator herein, by Order of the Court, or as otherwise agreed by the parties.

1.100.   "**Plan Administrator Reserve**" shall mean the initial amounts to be funded by the Supporting Lender on the Effective Date equal to: (a) payment of all Allowed Administrative, Professional Claims, and Priority Claims; (b) payment of Plan Administrator Expenses; and (c) any records related to the foregoing.

1.101.   "**Plan Supplement**" shall mean the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be in form and substance acceptable to the Debtors and the Supporting Lender, in consultation with the Creditors' Committee, and which shall be Filed in the Chapter 11 Cases, and notice of which shall be served in accordance with the Solicitation Procedures Order, no later than the earlier of seven (7) days prior to (i) the Voting Deadline or (ii) the deadline to object to confirmation of the Plan, or such later date as may be approved by the Bankruptcy Court, as may be amended or supplemented by additional documents Filed in the Chapter 11 Case prior to the Effective Date as amendments to the Plan Supplement.

1.102.   "**Prepetition Credit Agreement**" means that certain Loan Agreement, dated as of May 31, 2018 as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

1.103.   "**Prepetition Credit Documents**" means the Prepetition Credit Agreement and all other agreements, documents, instruments, and amendments related thereto, including any

guarantee agreements, pledge and collateral agreements, Uniform Commercial Code financing statements or other perfection documents, intercreditor agreements, subordination agreements, fee letters, and any other security agreements.

1.104. "**Prepetition Lender Secured Claim**" shall mean the allowed prepetition Secured Claim of CrowdOut in the amount of no less than $21,194,462.39, plus unliquidated amounts including interest thereon and fees, expenses, charges and other obligations incurred in connection with the Prepetition Credit Documents, subject to the right of the Creditors' Committee to timely challenge the validity, priority or amount of the Prepetition Lender Secured Claim in accordance with the terms of the Final DIP Order.

1.105. "**Priority Claim**" shall mean and include both Priority Tax Claims and Priority Non-Tax Claims.

1.106. "**Priority Non-Tax Claim**" shall mean any and all Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

1.107. "**Priority Tax Claim**" shall mean a Claim or a portion of a Claim for which priority is asserted under section 507(a)(8) of the Bankruptcy Code.

1.108. "**Pro Rata**" shall mean the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

1.109. "**Professional**" shall mean any professional employed in these Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328 or 1103, or for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to sections 330 or 503(b)(4) of the Bankruptcy Code.

1.110. "**Professional Fee Bar Date**" shall mean the deadline for Filing all applications for Professional Fee Claims, which shall be the later of (i) forty-five (45) days after the Effective Date, and (ii) forty-five (45) days after the Closing Date.

1.111. "**Professional Fee Claims**" shall mean a Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and on or before the Effective Date.

1.112. "**Purchased Assets**" shall mean the assets set forth in the Asset Purchase Agreement as purchased by the Purchaser.

1.113. "**Purchased Records**" shall mean any Record relating to the period prior to the Closing Date that is included in the Purchased Assets as set forth more specifically in the Asset Purchase Agreement.

1.114.  "**Purchaser**" shall mean New PBS Brand Co., LLC, the designee of CrowdOut Capital LLC.

1.115.  "**Real Property Leases**" shall mean the Leases set forth in Exhibit E to the APA.

1.116.  "**Record**" shall mean with respect to the Business, the books, records, information, ledgers, files, invoices, **documents**, work papers, correspondence, lists (including client and customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data, supplier and vendor lists, purchase orders, sales and purchase invoices, production reports, personnel and employment records, financial and accounting records and similar materials related to the Business and specifically excluding Sellers' corporate minutes book and related corporate records and books, files and papers not otherwise relating exclusively to the Business.

1.117.  "**Rejected Leases Funding**" shall mean, to the extent that the Supporting Lender directs rejection of any of the Real Property Leases, additional cash equal to 20% of the allowed unsecured claim of an affected landlord, which shall be contributed to the GUC Trust within 10 (ten) days of rejection and shall be part of the GUC Trust Assets.

1.118.  "**Rejection Claim**" shall mean any Claim for amounts due as a result of the rejection by one of the Debtors of any Executory Contract under section 365 of the Bankruptcy Code, whether or not resulting from a rejection prior to Confirmation, or a rejection within 30 days thereafter, pursuant to any Designation Rights.

1.119.  "**Rejection Damages Bar Date**" shall mean the deadline by which a counterparty to an Executory Contract of the Debtor rejected under this Plan must File a proof of Claim for damages arising from such rejection, and shall be the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, or (b) 5:00 p.m. (prevailing Eastern time) on the date that is 30 days following service of an order approving rejection of any executory contract or unexpired lease of one of the Debtors.

1.120.  "**Released Causes of Action**" shall mean those causes of action of the Estates that were released pursuant to the Final DIP Order, Sale Order, or Plan (and Confirmation Order), as the case may be, which shall be consistent with the terms of the RSA.

1.121.  "**Released Party**" shall mean solely in its capacity as such: (a) the Debtors and each Debtors' respective current and former officers, directors, managers, and employees; (b) the liquidating or Reorganized Debtors, as applicable; (c) CrowdOut, in its capacity as prepetition and postpetition lender; (d) the Creditors Committee; and (f) with respect to each of the foregoing parties under (a) through (d), such Entity and its Associated Entities.  Notwithstanding the foregoing, the Released Parties shall not include Robert Thompson, Cracker Barrel, or Sortis Holdings, or any affiliated entities thereto.

1.122.  "**Reorganized Debtors**" shall mean the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

21

1.123.  "**Representatives**" shall mean with respect to an Entity, all of that Entity's current and former managed and controlled affiliates, subsidiaries, officers, directors, managers, managing members, principals, shareholders, members, partners, employees, agents, advisors, attorneys, professionals, accountants, investment bankers, consultants and other representatives and such Person's respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

1.124.  "**Restructuring Support Agreement**" or "**RSA**" shall mean the restructuring support agreement among the Debtors, the Creditors Committee, and CrowdOut dated January 25, 2021, as subsequently amended, and approved by the Court in the Final DIP Order,

1.125.  "**Retained Assets**" shall mean all of the Debtors' Assets existing on the Effective Date that were not previously sold, transferred or otherwise assigned to the Purchaser pursuant to the Sale and Sale Order, or otherwise delivered to the GUC Trustee as part of the GUC Trust Assets.

1.126.  "**Sale**" shall mean the sale of substantially all of the Debtors' Assets to the Purchaser pursuant to the Asset Purchase Agreement and the Sale Order.

1.127.  "**Sale Documents**" shall mean the Purchase Agreement, the Sale Order, and all documents, instruments, and agreements executed and delivered in connection with the consummation of the transactions contemplated by the Purchase Agreement.

1.128.  "**Sale Hearing**" shall mean the hearing to be held on the Sale Procedures Motion on March 10, 2021 at 10:00 a.m.

1.129.  "**Sale Procedures Motion**" shall mean the Debtors' Motion for Entry of an Order Approving (I)(A) the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections; (B) The Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (C) the Procedures for the Assumption and Assignment Of Executory Contracts and Unexpired Leases, (D) the Form and Manner of Notice of the Sale Hearing, Assumption Procedures, and Auction Results, and (E) Dates for an Auction and Sale Hearing, (II)(A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances, and (B) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Related Relief.

1.130.  "**Sale Order**" shall mean a Final Order approving the sale of substantially all of the Debtors' assets.

1.131.  "**Schedules**" shall mean the schedules of Assets and Liabilities, schedules of Executory Contracts and Statements of Financial Affairs Filed by the Debtors which were filed on January 21, 2021, pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time [Docket Nos. 119-150].

1.132.  "**Section 510(b) Claims**" shall mean any Claim for which a judgment has entered by Final Order or for which a stipulation has been reached thereby subordinating the Claim pursuant to Section 510(b) of the Bankruptcy Code.

1.133.  "**Secured Claim**" shall mean, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of one or more of the Debtors in and to property of the Estate, to the extent of the value of the Holder's interest in such property as of the relevant determination date. The defined term Secured Claim includes any Claim that is (i) subject to an offset right under applicable law as of the Petition Date, and (ii) a secured claim against the one or more of the Debtors pursuant to sections 506(a) and 553 of the Bankruptcy Code.

1.134.  "**Securities Law Claim**" shall mean means any Claim that is subject to subordination under section 510(b) of the Bankruptcy Code, whether or not the subject of an existing lawsuit, (a) arising from rescission of a purchase or sale of any equity securities of the one or more of the Debtors or an affiliate of one or more of the Debtor, (b) for damages arising from the purchase or sale of any such equity security, (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims, or (d) except as otherwise provided for in the Plan, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including, without limitation (i) any prepetition indemnification, reimbursement or contribution obligations of the Debtor, pursuant to the one or more of the Debtors' corporate charters, by-laws, agreements entered into any time prior to the Petition Date, or otherwise, and relating to Claims otherwise included in the foregoing clauses (a) through (c), and (ii) Claims based upon allegations that one or more of the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the sale of equity securities, or otherwise subject to section 510(b) of the Bankruptcy Code.

1.135.  "**Seller**" or "**Sellers**" shall mean the Debtors and (i) Brand Co, PB Social, PB Arlington, PB Atlanta, PB Austin, PB Austin Congress, PB Chicago, PB Cleveland, PB Dallas, PB Colorado, PB Indianapolis, PB, Minneapolis, PB RC, PB Sacramento and PB San Diego, and (ii) each of their respective permitted successors, designees and assigns.

1.136.  "**Solicitation Procedures Order**" shall mean this Court's Order approving the Motion of the Debtors (i) Approving on an Interim Basis the Adequacy of Disclosures in the Combined Plan and Disclosure Statement, (ii) Scheduling the Confirmation Hearing and Deadline for Filing Objections, (iii) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Plan and Disclosure Statement, and Approving the Form Of Ballot And Solicitation Package, and (iv) Approving the Notice Provisions entered on March 18, 2021 [Docket No. 422].

1.137.  "**Sortis**" shall mean Sortis Holdings, Inc., including PBS Lender LLC and PBS DIP Lender, LLC. and all affiliated entities and employees thereof.

1.138.  "**Sortis Claim**" shall mean any claim, secured or unsecured, of Sortis which are or were asserted against one or more of the Debtors.

1.139. "**Subordinated Claim**" shall mean any Claim that is subordinated to General Unsecured Claims pursuant to section 510 of the Bankruptcy Code or Final Order of the Bankruptcy Court.

1.140. "**Supporting Lender Sharing Cap**" means the limit from proceeds of GUC Trust Litigation Claims that may be received by the Supporting Lender, as set forth in the Restructuring Support Agreement.

1.141. "**Tax**" **or** "**Taxes**" shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

1.142. "**Third Party Release**" shall mean the voluntary releases to be granted pursuant to the Plan as set forth in Section 9.02 hereof.

1.143. "**Unclaimed Distributions**" shall mean any undeliverable or unclaimed Distributions.

1.144. "**Unimpaired**" shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.145. "**Unimpaired Class**" shall mean a Class of Claims that are not impaired within the meaning of Section 1124 of the Bankruptcy Code.

1.146. "**U.S. Trustee**" shall mean the office of the United States Trustee for the District of Delaware.

1.147. "**U.S. Trustee Fees**" shall mean fees payable pursuant to 28 U.S.C. § 1930.

1.148. "**Voting Agent**" shall mean Omni Agent Solutions or any successor appointed by the Bankruptcy Court.

1.149. "**Voting Deadline**" shall mean April 19, 2021, at 4:00 p.m. (prevailing Eastern time), the date and time by which ballots to accept or reject the Plan must be received by the Voting Agent in order to be counted, as set forth by the Solicitation Procedures Order.

## ARTICLE II.
## BACKGROUND

### 2.01    General Background

The Debtors are a chain of "eatertainment" venues that blends best in category scratch-kitchen culinary specialties, and industry leading craft cocktail and craft non-alcoholic programs. What makes the Punch Bowl experience unique is that each of the locations – which vary in size from 15,000 to 30,000 square feet – are design-forward environments that provide its patrons with a different and diverse selection of games including, among other things, bowling, scrabble,

shuffleboard, virtual reality, billiards, karaoke, vintage arcade games, ping-pong, darts, and skee-ball, and in one location, a nine-hole miniature golf course, that create a setting conducive to large corporate gathers as well as á la carte sales.

As a destination attractive for all ages and demographics, the Debtors successfully expanded from one location in Denver in 2012 to 20 locations in March 2020. Among other things, the Punch Bowl restaurants were featured in Inc. magazine and included in Fast Company's Top 50 List of The World's Most Innovative Companies. At its peak, the Debtors had more than 1,540 part and full time employees.

### (i)    The Companies' Structure

The Debtors are related entities (together with PBS HoldCo, LLC, and other related non-debtors, the "Company"), substantially all of which are organized in Delaware. The ultimate parent company PBS HoldCo, LLC ("HoldCo"), a non-debtor, owns all of the stock of Punch Bowl Social Inc., a Delaware corporation ("PBS Inc."). PBS Social, Inc., in turn, owns[4] all of the membership interests of PBS Brand Co., LLC, a Delaware corporation ("Brandco"). Brandco is the sole member[5] of thirty-four limited liability companies (the "Operational Companies"),[6] each of which is the owner of one location (or in some instances, a planned location). A number of the Operating Companies are not debtors. A copy of the Company's organizational chart that identifies the Debtors, their non-debtor parent, and the non-debtor Operational Companies, is attached as Exhibit A to the Declaration of Stacy J. Galligan in support of the Debtors' Chapter 11 Petitions and First Day Motions [Docket No. 15] (the "Galligan Declaration")[7].

### (ii)    The Companies' Historical Financing

The first location was opened from $4 million of raised capital. Until 2017, the Company continued to expand by opening new locations by raising capital at the enterprise level. As the Company continued to grow, the company required an additional infusion of capital from an institutional source, and in or about June 2017, the Debtors entered into an agreement with L. Catterton, through which HoldCo received an equity investment. As part of the transaction, L. Catterton received 49% of the equity in Holdco.

In December 2018, the Company had approximately 15 locations, and it sought greater financing and stability. The Company also understood that it no longer fit within the investment parameters for the growth fund at L. Catterton from which it had received funding, and in July 2019, the Company entered into an acquisition agreement with Cracker Barrel Old Country Store, Inc. ("Cracker Barrel"), a well-known and respected national restaurant chain with more than 650 locations. As part of the transaction, set forth in the Second Amended and Restated Limited Liability Company Agreement of PBS Holdco, LLC, a Cracker Barrel affiliate agreed to fund up

---

[4]    As more fully set forth herein, since the Petition Date, the Debtors have sold their equity interest in substantially all of the non-debtor Affliates to Sortis.

[5]    One of the Operating Companies, Punch Bowl Detroit, LLC, is a joint venture in which twenty percent (20%) is owned by a third party.

[6]    For purposes of clarification, some of the Operating Companies are not and never have, in fact, operated. At least one venue has permanently closed, and other Operating Companies are parties to leases, of which some were in the process of construction when they closed due to COVID-19. Others were still in the planning stages, but had not yet executed leases.

[7]    As more fully set forth herein, the organizational chart does not reference two of the Operational Entities as debtors, as such debtors filed later than the Original Debtors, as that term is defined herein.

to $51 million to fund the company's capital expenditures, which was guaranteed by Cracker Barrel. Further, Cracker Barrel received approximately 59% of Punch Bowl Social's economic interest and approximately 49.7% of its voting interests. Further, Cracker Barrel received the ability to designate two managers to a five-person board of managers of Holdco. L. Catterton does not currently have any financial interest in the ownership of any of the Debtors.

On or about May 31, 2018, Brandco and CrowdOut Capital LLC ("CrowdOut") entered into a loan agreement (as subsequently amended, the "CrowdOut Promissory Note") by and through which CrowdOut loaned $20,000,000 to Brandco. The obligations due under the CrowdOut Promissory Note were guaranteed by certain of the Operating Companies, and secured by the PBS, Inc.'s interest in Brandco's shares or membership interests pursuant to a certain Security Agreement Pledge dated May 31, 2018 (the "CrowdOut Pledge Agreement").

On September 26, 2019, after one of the Company's locations was closed, CrowdOut declared a default under the CrowdOut Promissory Note due to the Company's EBITDA ratio. On January 2, 2020, the Company, Cracker Barrel, and CrowdOut entered into a forbearance agreement (the "Forbearance Agreement") by and through which CrowdOut agreed to forbear from exercising available rights and remedies under the Promissory Note and deposit control agreement until March 15, 2020. Among other things, the forbearance agreement also required that (i) on or prior to January 2, 2020, Cracker Barrel would deposit with CrowdOut $2,000,000 for the benefit of Brandco; (ii) on or prior to January 17, 2020, Cracker Barrel would deposit with CrowdOut an additional $1,500,000; and (iii) prior to March 15, 2020, Cracker Barrel's board of directors would effectuate a guaranty of the loan obligations or repay the loan to CrowdOut. In accordance with its obligations under the Forbearance Agreement, Cracker Barrel timely remitted a total of $3.5 million to CrowdOut due under the Forbearance Agreement, however it did not effectuate and deliver the guaranty as required by the Forbearance Agreement, as described below.

(iii)     <u>COVID-19 and the Results on the Debtors</u>

The Debtors' businesses were immediately and significantly adversely affected by COVID 19. On March 14, 2020, the country was realizing the extent which COVID-19 would affect the hospitality, restaurant and travel industries. In that context, Cracker Barrel notified the Debtors and CrowdOut that it had not and would not execute a guaranty as required under the Forbearance Agreement. Starting in or about mid-March 2020, restaurants, sporting venues and other businesses throughout the country, such as those operated by the Debtors, were the subject of various regulations and closures by state and local governments requiring social distancing.

On March 16, 2020, due to Cracker Barrel's failure to deliver the required guaranty under the Forbearance Agreement, CrowdOut issued a Notice of Forbearance Termination Event, Notice of Acceleration and Reservation of Rights to the Debtors and Cracker Barrel, and on March 20, 2020, CrowdOut issued a notice of intent to sell the collateral. In its March 20, 2020 notice, CrowdOut stated that, unless it received payment in full by 5:00 p.m. CDT on March 24, 2020, for the entire unpaid principal balance of the indebtedness, including all interest and other sums due by Brandco under the CrowdOut Promissory Note and related agreements, CrowdOut statd that it would commence a process of selling the membership interests of Brandco held by PBS, Inc., including by immediately providing notice of the sale to the public and those parties entitled to receive notice pursuant to the Uniform Commercial Code of New York, and by contacting potential buyers. CrowdOut ultimately determined not to commence any such foreclosure and sale process at that time

26

On August 17, 2020, CrowdOut, acting its capacity as a secured creditor with authority pursuant to the Pledge Agreement, executed a Joint Written Consent of the Member and Managers of Brandco (the "August 17 Written Consent"). By the August 17 Written Consent, CrowdOut appointed John W. Haywood as Chief Executive Officer of Brandco, effective August 14, 2020.

Further, by the August 17 Written Consent, CrowdOut authorized the Company to retain PJ Solomon Securities, LLC ("PJ Solomon") as the Company's investment banker and/or placement agent. The Debtors understand that PJ Solomon conducted a thorough search for interested purchasers, and while the Debtors received multiple offers for their assets, ultimately, PJ Solomon was not able to achieve a sale of the Debtors' assets.

(iv)    Notice of Foreclosure by CrowdOut

Following PJ Solomon's unsuccessful efforts to close a sale on substantially all of the Company's assets, on December 10, 2020, CrowdOut issued a Notice of Public Disposition of Collateral under Uniform Commercial Code by and through which it stated it intended to offer for sale the following collateral at public sale to be held on December 28, 2020 the following assets:

- All of the limited liability company interests in Brandco and the Operating Entities; and

- All of the personal property of the Operating Entities, including but not limited to the following property, whether now owned or existing or hereafter acquired or arising and regardless of where located: (i) Accounts, (ii) Inventory; (iii) Fixtures; (iv) Equipment; (v) General Intangibles; (vi) Chattel Paper; (vii) Instruments; (viii) Documents; (ix) Letter of Credit Rights; (x) Deposit Accounts; and (xi) Proceeds.

As of December 21, 2020, the Debtors owed approximately $21,194,462.39 to CrowdOut, with such amounts continuing to accrue interest at the default rate due under the applicable loan documents.

(v)    Prepetition Loan from PBS Lender, LLC

On or about December 10, 2020, PBS Lender, LLC, an affiliate of Sortis, entered into a note and a loan and security agreement (collectively, the "December 10 Loan Agreement") with the Debtors and certain of their non-debtor affiliates, by and through which Sortis loaned Two Hundred Sixty-One Thousand Five Hundred and 00/100 Dollars ($261,500.00) to the Debtors and certain of their non-debtor affiliates, for the purposes of paying retainers fees, and expenses of restructuring counsel and a financial advisor; and for working capital and general corporate purposes, including the payment of rent and other lease expenses, to the extent reasonably necessary to preserve or enhance the value the Company's assets.

The December 10 Loan Agreement was entered into with the expectation (but not the requirement) that the Debtors would enter into a postpetition loan with Sortis or one of its affiliates to be approved by the Bankruptcy Court on interim and final bases, with the goal of a filing and confirming a plan by April 30, 2021. CrowdOut has asserted that entry into the December 10 Loan Agreement was in violation of its loan documents. The Debtors disagree.

(vi)    The Debtors Other Prepetition Obligations

As of December 21, 2020, the Debtors had at least one creditor that could assert a construction lien for work done at one of the venues.

The Debtors also owed approximately $465,000 of federal withholding taxes that were not due until December 31, 2021 and December 31, 2022, because the Debtors elected to defer payment as allowed under the CARES Act.

In addition to secured obligations and priority taxes, the Debtors currently have unsecured debt that they estimate as between $18,000,000 and $23,000,000, including more than $10,000,000 owed by Brandco to JPMorgan Chase Bank, N.A., in connection with the Paycheck Protection Program. The Debtors anticipate that, in accordance with the CARES Act, more than $7,500,000 of the amount due to JPMorgan Chase Bank, N.A. is eligible for loan forgiveness as such amounts were used by the Debtors for eligible payroll costs and payments for certain eligible business expenses during the loan period providing for forgiveness eligibility.

As of December 21, 2020, the Debtors estimate that they may also owe more than $5,500,000 to landlords for rent, including common area maintenance charges, plus as much as $6,800,000 of rent due by non-debtor Operating Companies for which Brandco is liable as a guarantor. Brandco is also responsible for payment of obligations to certain suppliers and other trade vendors that, the Debtors estimate to be approximately $3,500,000. The Debtors also estimate that as of December 21, 2020, they had obligations to their employees for wages and benefits and related costs in an aggregate amount of less than $250,000.

(vii)    State of the Debtors' Operations Prior to Bankruptcy Filing

As of the week of December 21, 2020, the Company was operating just three venues at limited capacity. Shortly thereafter, one of those three locations closed due to COVID-related restrictions. Further, because of state and local restrictions limiting the number of patrons at each venue, as well as the public's uneasiness about going out to eat or drink in public during a pandemic, each of those venues was losing money on a daily basis.

Based upon the Debtors' fixed costs, including rent for locations that are not open, and the Debtors' limited operations, since December 21, 2020, the Debtors continued to incur more debt for operations than the income generated.

**2.02    The Debtors' Bankruptcy Filing**

On December 21, 2020, faced with a pending foreclosure by CrowdOut, thirteen of the Debtors (the "Original Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court, and on December 31, 2020, two other related entities filed voluntary Chapter 11 petitions, thereby commending the Chapter 11 Cases.

(i)    The Debtors' First Day Pleadings

On the Petition Date, the Original Debtors filed a number of motions and applications (collectively, the "First Day Motions"), all with the purpose of enabling the Debtors to maintain the value of their businesses by averting foreclosure to enable the Debtors to reorganize and restructure their liabilities as a going concern. Among other things, the Original Debtors sought separate motions seeking the following relief: (i) authorizing the retention of Omni Agent Solutions (the "Voting Agent") as claims, noticing and balloting agent effective as of the Petition Date (ii) prohibiting utilities from discontinuing service [Docket No. 6], (iii) for authority to pay

28

prepetition employee wages and other benefits [Docket No. 7], (iv) for authority to maintain their bank accounts [Docket No. 8], and (v) for authority to continue their prepetition insurance polies [Docket No. 9]. The Court subsequently granted the relief sought by each of those motions.

On December 23, 2020, the Court granted the Original Debtors' motion for joint administration of the Original Debtors' bankruptcy cases [Docket No. 28], and on January 26, 2021, the Court approved a second motion for joint administration that included the joint administration for the bankruptcy cases of the Debtors that filed for Chapter 11 relief on December 31, 2021 [Docket No. 185].

(ii)    Postpetition Interim Financing

On December 22, 2020, the Debtors filed a motion to approve postpetition financing from Sortis and for the use of cash collateral [Docket No. 11] (the "Original DIP Motion"). Specifically, by and through the Original DIP Motion, the Debtors sought authority pursuant to a term sheet (the "Sortis DIP Term Sheet") to borrow up to $1,500,000 on an interim basis and up to $6,175,000 on a final basis. The proposed loan from Sortis to the Debtors was to be funded in two separate tranches: (i) Tranche A, which was to fund the Debtors' postpetition operating costs, which include payroll and payroll related expenses, rent, utilities, insurance, tax, and other ordinary course necessary business expenses ("Tranche A Expenses"), and (ii) Tranche B, which was to fund the payment of non-operating disbursements, such as restructuring professionals, Sortis' professionals, the Claims and Noticing Agent, and fees of the United States Trustee ("Tranche B Expenses").

As more fully set forth in the Sortis DIP Term Sheet, the Debtors were seeking to prime all existing liens on an interim basis solely with respect to any Tranche A Expenses, but not seeking to prime existing liens on an interim basis for any Tranche B Expenses. As between the two tranches, the rate of interest was different based upon their risk: The non-default interest rate for loans made on account of Tranche A Expenses was to be LIBOR + 9% per annum and the non-default interest rate for loans made on account of Tranche B Expenses was to be 18% per annum, provided that upon entry of a final order approving the Sortis DIP Term Sheet, loans under Tranche B would bear interest at the same rate as Tranche A, effective retroactive to the Petition Date. Interest under the proposed Sortis loan facility would accrue during the Chapter 11 Cases but would not be payable until the May 15, 2021 Maturity Date (as defined in the Sortis DIP Term Sheet).

By and through the Original DIP Motion, the Debtors sought, on an interim basis, to prime prepetition liens only for Tranche A Expenses, but anticipated seeking to prime all prepetition liens in favor of the Bridge Lender and CrowdOut, on a final basis. The Sortis DIP Term Sheet also provided for a commitment fee of 5% on the commitment amount, which would be reduced to 3% upon entry of a final Order and an exit fee of 2% on all funded amounts and outstanding commitments under the DIP Facility.

Immediately prior to the hearing to consider the Original DIP Motion on an interim basis, CrowdOut filed an objection to the proposed financing, arguing among other things, that it did not consent to the priming of its lien and that the proposed financing from Sortis did not provide CrowdOut with adequate protection as required by Section 361 of the Bankruptcy Code. Most significantly from an economic perspective, CrowdOut stated that it was willing and able to

provide postpetiton financing on terms "markedly better and more favorable to the Debtors" than as set forth in the Sortis DIP Term Sheet.

Following a recess in the hearing, the Debtors and CrowdOut reached an agreement on terms of proposed financing on an interim basis, by and through which the Debtors would be entitled to obtain postpetition financing of up to $2,500,000 on an interim basis pursuant to a term sheet (the "CrowdOut Term Sheet"), with such funds to be used pursuant to a budget. Pursuant to the terms of the CrowdOut Term Sheet, the terms of the postpetition financing from CrowdOut would be senior to CrowdOut's prepetition liens, and provided adequate protection together prepetition secured obligations to the extent of any diminution for the value of in value of the CrowdOut's and Sortis' prepetition liens. The economic terms of the proposed financing with CrowdOut provided that interest would accrue on the DIP Loans at the rate of LIBOR + 6% per annum. The CrowdOut Term Sheet did not include any commitment or exit fees.

On December 24, 2020, the Court entered an interim Order approving the CrowdOut Term Sheet and authorizing the use of cash collateral, and setting a hearing to consider final approval of any postpetition financing and for use of cash collateral for on January 13, 2021 [Docket No 43] (the "First Interim DIP Order").

On January 6, 2021 the United States Trustee appointed an Official Committee of Unsecured Creditors to serve in these cases. Between the entry of the First Interim DIP Order and the January 13 hearing, the Debtors attempted to negotiate a final term sheet with Sortis and CrowdOut. Ultimately, the Debtors could not reach a final agreement with either, and at the request of the newly-formed Creditors' Committee, the Debtors and CrowdOut agreed to continue the terms of the postpetition financing. On January 13, 2021, following a hearing to consider, among other things, the DIP Motion, the Court entered an Order that further extended through January 22, 2021, the authority of the Debtors to borrow from CrowdOut on substantially the same terms as set forth on the terms set forth in the CrowdOut Term Sheet, and setting a final hearing set for January 20, 2021 [Docket No. 82] (the "Second Interim DIP Order"). At the Court's request, the January 20 hearing was subsequently moved to January 22, 2021.

Between the entry of the Second Interim DIP Order and the January 22 hearing, the Debtors continued to negotiate a final term sheet with Sortis and CrowdOut, but again, the Debtors and the Committee could not reach a final agreement with either.

Prior to the hearing on January 22, 2021, the Debtors reached an agreement with CrowdOut to again continue the borrow from CrowdOut on substantially the same terms as set forth on the terms set forth in the CrowdOut Term Sheet, and setting a final hearing for February 6. Prior to the January 22, 2021 hearing, Sortis filed an objection to the proposed financing based upon, among other things, alleged lack of notice, alleged evidentiary deficiencies, and the allegation that Sortis had offered a superior alternative offer for postpetition financing [Docket No. 160]. Additionally, immediately prior to the January 22, 2021 hearing, CrowdOut filed an Emergency Motion for Appointment of a Chapter 11 Trustee [Docket No. 157] (the "Chapter 11 Trustee - Motion"), and a motion to have the Chapter 11 Trustee Motion heard on an expedited basis [Docket No. 158].

At the conclusion of the hearing on January 22, 2021, the Court overruled Sortis' objection, granted the request for entry of a third interim order on substantially the same terms as set forth on the terms set forth in the CrowdOut Term Sheet, and authorized the continued postpetition financing and use of cash collateral through February 4, 2021. At the hearing, the Court directed

that, no later than January 25, 2021, the Debtors shall file a motion for a proposed final order approving postpetition financing, including a proposed final order (the "Final DIP Motion"), and directing that the Debtors serve a copy to (i) proposed counsel to the Committee, (ii) the office of the United States Trustee, (iii) counsel to Sortis, and (iv) all other parties having entered an appearance in these Chapter 11 cases. Further, the Court set a hearing to consider the Final DIP Motion for February 4, 2021 at 10:00 a.m. and required that any objections or responses to entry of a final order on the Final DIP Motion must be filed on February 2, 2021 at 4:00 p.m. On January 22, 2021, the Court entered the third interim Order granting the Postpetition DIP Motion [Docket No. 165].

(iii)    The Final DIP Motion and Restructuring Support Agreement

As directed by the Court, almost immediately following the January 22, 2021 hearing, the Debtors, the Committee and CrowdOut began negotiating the terms of a postpetition financing term sheet (the "Final DIP Agreement"), which included, as a key provision, a restructuring support agreement (the "RSA"), by and through which the Debtors would conduct a process for the marketing and sale of the Debtors' assets, either through a plan or standalone sale under Section 363 of the Bankruptcy Code and emerge from bankruptcy by the April 30, 2021.

On Sunday, January 24, 2021, Sortis provided to the Debtors and the Committee "for discussion purposes only," a plan support and term sheet. After consultation with the Committee, the Debtors elected to pursue the Final DIP Agreement with CrowdOut. On January 25, 2021, the Debtors, the Committee, and CrowdOut concluded their negotiations of the Final DIP Agreement, including the RSA, and on January 25, 2021, the Debtors filed the Final DIP Motion [Docket No. 181].

1.    The Final DIP Agreement

As more fully set forth in the Final DIP Agreement, CrowdOut agreed to lend the Debtors up to $11,212,000 under a multi-draw term loan facility, subject to a budget, and culminating in the confirmation and effective date of a plan by April 30, 2021, as more fully detailed in the RSA. The economic terms of the proposed financing included an interest rate of just 0.14% and no commitment or exit fees.

By the Final DIP Agreement, CrowdOut would receive a superpriority perfected security interest in and liens upon substantially all of the Debtors' assets, other than those specifically exempted as set forth therein (the "DIP Collateral"), subject only to permitted prior senior liens, if any, including those of Sortis, and granting junior perfected security interests in and liens upon all DIP Collateral, and providing adequate protection to other secured creditors. The Final DIP Agreement also provided a carve-out for estate professionals and certain other administrative expenses in an event of default. The Final DIP Agreement also preserved the rights of the Committee to challenge any prepetition liens of and claims against CrowdOut within the sixty (60) days following the formation of the Committee, although the commencement of such action would be an event of default. Further, as a condition of the loan from CrowdOut, the estates waived claims under 506(c) and 552 of the Bankruptcy Code as against CrowdOut.

Finally, the execution and compliance with the RSA negotiated among the Debtors, the Committee, and CrowdOut was expressly an integral term and condition of the DIP Loan Agreement.

2.    The Restructuring Support Agreement

31

Among other things, the RSA includes milestones for a five-week process culminating in the sale of the Debtors' assets through either a standalone sale under section 363 of the Bankruptcy Code or a plan. Further, the RSA expressly provided that CrowdOut would, by virtue of its prepetition secured claims (which remain subject to challenge by the Committee) and postpetition secured claims, be required to credit bid and/or assume the entirety of its secured claims, and therefore be deemed a qualified bid for purposes of a sale of the Debtors' assets. Significantly, the RSA did not require that the Debtors name CrowdOut as a stalking horse for the Debtors' assets, thereby enabling the Debtors to maximize the flexibility of a marketing process.

The RSA also created the structure for a plan process for the Debtors' emergence from Chapter 11, including the establishment and funding of the GUC Trust with the GUC Trust Assets. The RSA was intended by the Debtors, CrowdOut, and the Committee to set a floor by and through which unsecured creditors are guaranteed a recovery on account of their claims. Such funding includes the following, which are defined as the GUC Trust Assets:

- The GUC Trust Distributable Cash, which shall be escrowed by the GUC Trustee and used solely for distributions to unsecured creditors. CrowdOut agreed that the GUC Trust Distributable Cash shall be a carve-out of the Supporting Lender's secured claim;

- The GUC Trust Participation Funding. CrowdOut agreed that the GUC Trust Participation Funding shall be a carve-out of the CrowdOut's secured claim;

- The Ongoing Trade Claim Surplus;

- The Liquor License Funding, to the extent applicable;

- The Rejected Leases Funding, to the extent applicable; and

- The GUC Trust Litigation Claims.

In exchange for the funding of the GUC Trust Assets, if CrowdOut (or its designee)- is the successful bidder for the Debtors' assets, it will participate with the trustee of the GUC Trust in recoveries from GUC Trust Litigation Claims (but not any other recoveries) made by the GUC Trustee as follows: 50% of the first $500,000 in net recoveries to CrowdOut, 20% of the net recoveries between $500,000 and $1.5 million, and 25% of all recoveries in excess of $1.5 million. Notwithstanding the above, except to the extent that CrowdOut receives a Rejected Lease Deposit (as defined in the RSA), the 25% sharing arrangement shall cease upon the CrowdOut receiving from the GUC Trustee on account of recoveries on GUC Trust Litigation Claims, a sum total of $1 million (the "Supporting Lender Sharing Cap").

Additionally, as set forth in the RSA, if CrowdOut (or its designee) is the successful bidder for the Debtors' assets), it will assume the following liabilities of the estate:

- all administrative and priority claims listed on Schedule E to the extent such claims are allowed by final order of the Bankruptcy Court, except to the extent the holder of such claims agrees to other treatment;

- all event deposit obligations and gift card obligations of the Debtors, including but not limited to, the obligations attendant to the $1.1 million in event deposits listed on Schedule E;

- the Ongoing Trade Claim Surplus; and

- the Real Property Leases on terms acceptable to the Supporting Lender in its sole discretion, with the Supporting Lender committing to cure or otherwise eliminate all unpaid prepetition claims of the landlord counterparty to such lease(s), *provided, however*, that to the extent that the Supporting Lender cannot agree with any particular landlord regarding the terms of assumption and assignment of any Real Property Lease, the Supporting Lender reserves the right to reject such Real Property Lease; *provided further*, however, that to the extent that the Supporting Lender directs rejection of any of the Real Property Leases, it will provide the GUC Trust with distribution dilution in the form of the Rejected Leases Funding. To the extent that the Supporting Lender rejects any Real Property Lease and deposits a Rejected Leases Funding with the GUC Trust, the Supporting Lender Sharing Cap shall be increased on a dollar-for-dollar basis, such that the Supporting Lender will be entitled to continue to share in the 25% sharing arrangement for amounts collected by the GUC Trust until it recovers on any and all Rejected Lease Funding.

Taken together, if CrowdOut or its designee was the successful bidder for substantially all of the Debtors' assets, a significant portion of the Debtors' liabilities would be assumed, and the GUC Trust would receive $500,000 for distribution on account of those remaining claims, plus the GUC Trust would receive funding for administration and prosecuting certain causes of action of the estates..

Additionally, the Crowd Out was deemed to be a qualified bidder for the Debtors' assets, which remained subject to higher and better bids, including payment of CrowdOut's prepetition and postpetition secured claims in full. Accordingly, the agreement among the Debtors, the Committee, and CrowdOut, as set forth in the RSA, served as a floor for bids to be received on account of the Debtors' assets. In other words, any bid were required to be better than what the estates were to receive from CrowdOut's offer.

Further, the RSA expressly preserved the "fiduciary out" obligations of the Debtors and the Committee, although the exercise of such fiduciary out, may be an event of default, thereby terminating the Final DIP Agreement and/or the RSA.

In addition, the DIP provided for (i) financing that includes for payment of expenses pursuant to a budget that charges next to no interest and no fees, and (ii) procedural and substantive baseline for the sale of the Debtors' assets and confirmation of a plan, the RSA also resolved the Chapter 11 Trustee Motion. By agreement of the parties, the Debtors agreed that, no later than February 5, 2021, the boards of the Debtors would appoint Edward T. Gavin, IV, CTP, of Gavin/Solmonese LLC,[8] and Mark Shapiro, of B. Riley Advisory Services, as co-Chief Restructuring Officers (collectively, the "CROs").

Prior to the Debtors taking any action with respect to subparts (a) through (d) below, Mr. Shapiro, in his capacity as Co-CRO shall, on behalf of the Company and each of the Debtors, issue

---

[8]    By prior resolution of the Debtors' respective boards of managers and directors, Mr. Gavin was already serving as the Debtors' CRO.

a report and recommendation to the Debtors' two existing boards of directors or members, with respect to any decision related to the following actions:

    a) The highest and best bid as contemplated by the Bid Procedures, whether through a sale or a plan sponsor transaction;

    b) The terms of any plan of reorganization or liquidation filed by the Debtors in the Bankruptcy Cases;

    c) The Debtors' compliance with the terms of the RSA; and

    d) The exercise of any fiduciary out by the Debtors in connection with any restructuring support agreement, proposed sale transaction, plan sponsor agreement or any other matter in which the Debtors may have a fiduciary out.

To the extent the Board disagrees with Mr. Shapiro's report and recommendation with respect to the above actions, the Debtors shall file immediately file a motion with the Bankruptcy Court—which motion shall be heard on an emergency basis subject to the Court's availability—to seek approval of such actions to be pursued by the Debtors' respective boards over Mr. Shapiro's recommendation. In the event the Court grants the relief sought by the Debtors' respective boards on behalf of the Debtors, a DIP Termination Event (as defined in the RSA) will be deemed to have occurred and this RSA shall be deemed to have immediately terminated. For the avoidance of doubt, in the event that the Board disagrees with Mr. Shapiro's report and recommendation, the Debtors shall not be authorized to take any action with respect to (a) through (d) above absent further order of the Court.

Mr. Gavin, in his capacity as Co-CRO has discretion, on behalf of the Company and each of the Debtors, and subject to order of the Bankruptcy Court, to determine all other aspects and issues in the Bankruptcy Cases as may be considered necessary and appropriate by Mr. Gavin in his capacity as Co-CRO in his business judgment necessary to maximize the value of the Debtors' estates.

It shall be a further DIP Termination Event and the RSA shall be deemed terminated if the CROs are removed for any reason or any of their responsibilities outlined herein are modified in any respect.

Upon the appointment of the CROs, pursuant to the terms set forth herein, CrowdOut agreed to withdraw its motion for appointment of a Chapter 11 Trustee, without prejudice.

On January 30, 2021, the Debtors' managers ratified the terms of the Final DIP Agreement and RSA.

### 3. The Final DIP Hearing

In support of the Final DIP Motion, on February 2, 2021, the Debtors filed the Declaration of Edward T. Gavin, the Debtors' Chief Restructuring Officer in support of the Final DIP Motion [Docket No. 222]. As set forth in his declaration, Mr. Gavin testified, among other things, that since the inception of these cases, he and others from Gavin/Solmonese, in concert with the Debtors and their professionals, attempted to identify funding sources for post-petition financing on the best terms available from interested lenders, including; contacting over 30 additional potential funding sources including funds, traditional and non-traditional lenders, and bankers experienced in lending to bankrupt or distressed debtors; presented information to those who requested it, and; discussed the Debtors' business with those who expressed interest. Ultimately, only Sortis or CrowdOut were determined to be possible sources of post-petition funding for

debtor-in-possession financing and the Debtors continued to negotiate with both Sortis and CrowdOut during most of the Chapter 11 Cases.

As set forth in his declaration, Mr. Gavin testified that, after receipt of the Sortis Term Sheet, the Debtors and the Committee conferred with respect to the respective proposals of CrowdOut and Sortis. After consideration of the respective terms of the proposal by Sortis, which relied upon Sortis' prior offers to provide postpetition financing, and the proposal of CrowdOut, and pursuant to the authority provided to Mr. Gavin as CRO, Mr. Gavin determined in his business judgment that the proposed financing reflected in the Final DIP Motion constituted the best proposal available to the Debtor under the circumstances of these cases.

Mr. Gavin further testified that, among other things, the most significant factors in determining that the CrowdOut proposal was more favorable than the proposal by Sortis for the following reasons: (i) the Sortis proposal does not expressly include any statement about interest and fees, but Sortis' prior proposals included interest and fees that were materially higher than those set forth in CrowdOut's proposal; (ii) the Sortis proposal sought to prime the Debtors' other secured creditors, which would be opposed by CrowdOut, and by contrast, CrowdOut's proposed terms of financing does not seek to prime any other parties; (iii) the CrowdOut proposal allowed the Debtors flexibility toward a sale or plan process as CrowdOut did not require that the marketing culminate in a plan of reorganization, but could result in either a plan or a standalone sale, whereas the Sortis Term Sheet required that, through the marketing process, Sortis would serve as the "stalking horse" proposal, subject to a break-up fee and expense reimbursement in Sortis' favor, as opposed to CrowdOut's proposal which did not mandate that it serve as a stalking horse.

Finally, Mr. Gavin testified that, while it was certainly not the most important reason, when considering the two proposals, the Debtors were also cognizant that the Committee had already negotiated a resolution with CrowdOut that guaranteed a recovery for unsecured creditors, whereas Sortis had not achieved any such resolution with the Committee. Given the Court's requirement that the Debtors file a motion to approve final financing by January 25, 2021, the receipt of Sortis' proposal on the afternoon of January 24, 2021, would not leave sufficient time for the Committee and the Debtors to negotiate a plan term sheet and proposed order.

All of those factors, coupled with the Court's directive that the Debtors submit a Final DIP Order that could be approved, led the Debtors and their professionals and Mr. Gavin, in consultation with the Committee's advisors, to determine, in the exercise of the Debtors' business judgment, that the economic differences between the two proposals and the certain of impact on unsecured creditors made the CrowdOut proposal reflected in the Final DIP Motion the superior and, importantly, the more likely achievable, proposal.

Notwithstanding the Court's express direction that all objections to the Final DIP Motion, be filed by February 2, 2021 at 4:00 p.m., on February 2, 2021 at 4:05, Sortis filed a motion to extend the objection deadline [Docket No. 242]. On February 3, 2021, Sortis filed an objection, to the Final DIP Motion [Docket No. 236], and at 11:20 p.m. on February 3, 2021 – less than eleven hours prior to the hearing, Sortis filed a declaration of Paul Brenneke in support of Sorts' Objection [Docket No. 242].

At the hearing to consider the Final DIP Motion, Mr. Gavin testified in support of the Final DIP Motion. Sortis declined to offer any witness testimony and ultimately withdrew its objection to the Final DIP Motion. At the conclusion of the hearing, the Court approved the Final DIP Motion, and on February 4, 2021, the Court entered an Order granting the Final DIP Motion,

including approving the RSA [Docket No. 250]. Sortis subsequently sealed the declaration of Mr. Brenneke. The Debtors, on behalf of the estates, expressly reserved their rights and potential claims against Sortis in connection with, among other things, all harm caused to the Debtors' estates by burdensome, vexatious, and harassing discovery sought by Sortis' opposition to the Final DIP Motion.

Consistent with the RSA, effective February 5, 2021, the Debtors retained, subject to Court approval, Mr. Shapiro as Co-CRO of the Debtors, and on February 16, 2021, CrowdOut withdrew the Chapter 11 Trustee Motion [Docket No. 294].

### 2.03   The Debtors' Prepetition Marketing Process, the Postpetition Retention of SSG Advisors, LLC, the Motion to Establish Bidding Procedures

As more fully set forth herein, prior to filing for bankruptcy relief, the Debtors retained PJ Solomon to market its assets, but ultimately, PJ Solomon was not able to achieve a sale of the Debtors' assets.

On January 7, 2021, the Debtors retained SSG Advisors, LLC ("SSG") as their investment banker. An application to retain SSG was filed on February 25, 2021 [Docket No. 180]. The application to retain SSG is currently pending. Since its retention, SSG has contacted more than 215 potentially interested parties, including potentially strategic purchasers and potentially financial purchasers. This process is ongoing.

On January 27, 2021, the Debtors filed a Motion for Entry of an Order Approving (I)(A) the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections; (B) The Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (C) the Procedures for the Assumption and Assignment Of Executory Contracts and Unexpired Leases, (D) the Form and Manner of Notice of the Sale Hearing, Assumption Procedures, and Auction Results, and (E) Dates for an Auction and Sale Hearing, (II)(A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances, and (B) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Related Relief [Docket No. 275] (the "Sale Procedures Motion"). By the Sale Procedures Motion, the Debtors sought procedures for the appointment for the sale of substantially all of the Debtors' assets, either through a standalone sale pursuant to Section 363 of the Bankruptcy Code, or through a plan pursuant to section 1129 of the Bankruptcy Code.

On February 8, 2021, the Court entered an Order approving the Sale Procedures Motion [Docket No. 280] (the "Sale Procedures Order"). As more fully set forth in the Sale Procedures Order, the deadlines included the following:

(i)    The Debtors, after consultation with the Committee, were authorized to select the Stalking Horse Bidder no later than February 17, 2021;

(ii)   the Debtors were to file a notice of Proposed Stalking Horse seeking approval of bid protections no later than February 18, 2021,

(iii)  The Debtors were to provide each counterparty to an executory contract or lease a notice, including the cure amounts due in connection with the executory contract or lease no later than February 19, 2021;

(iv)   All bids for the Debtors' assets were due March 3, 2021 at 4:00 p.m.;

(v)    Objections to all proposed cure amounts were due no later than March 3, 2019 at 4:00 p.m.;

36

(vi)     If the Debtors received any bids other than CrowdOut's bid, an auction was to be held on March 8, 2021, at 10:00 a.m.;

(vii)    All objection to the sale other than cure amounts were due no later than March 9, 2021 at 4:00 p.m.;

(viii)   If the successful bidder seeks to purchase the Debtors' assets through a standalone sale pursuant to Section 363 of the Bankruptcy Code, a hearing to consider approval of the Sale would be scheduled for March 10, 2021, at 10:00 a.m., with the sale to close no later than March 19, 2021;

(ix)     If the successful bidder sought to purchase the Debtors' assets through a plan pursuant to Section 1129 of the Bankruptcy Code, a confirmation hearing would be held on April 28, 2021 at 10:00 a.m., and the plan must go effective no later than April 30, 2021.

On February 17, 2021, the Debtors, after consultation with the Committee, determined that CrowdOut or its designee would be the stalking horse and subject to further Court approval, would be permitted certain bid protections as set forth in the Sale Procedures Order (the "CrowdOut Bid").

Among other things, and as more fully set forth in the Asset Purchase Agreement and in furtherance of the RSA, the Purchaser agreed to total consideration including (i) a credit bid of $21,194,462.39 (from which $1,000,000 for the GUC Trust was carved out from the proceeds of the Supporting Lender's secured Claim), representing Buyer's estimate of Prepetition Obligations under the Loan Agreement as of March 19, 2021 (as an assumed Closing Date), (ii) assumption of $11,212,000 under the DIP Obligations as of April 30, 2021, (iii) the Ongoing Trade Claim Surplus; (iv) the Liquor License Funding, to the extent applicable, (v) the Rejected Leases Funding, to the extent applicable, and (vi) the assumption of certain liabilities.

Further, under the Asset Purchase Agreement, the Purchaser received the right to designate executory contracts and leases for assumption and assignment at any time through and including April 20, 2021.  In the event that the Purchaser did not cause executory contracts and leases to be assumed and assigned at closing, the Purchaser would be responsible for payment of all costs until the earlier of rejection or April 21, 2021.  Under the Asset Purchase Agreement, the Purchaser also received the right to designate through as late as April 20, 2021, the Debtors' equity in certain nondebtor Affiliates either as Purchased Assets or Excluded Assets. The CrowdOut Bid was subject to higher and better bids that were due by March 3, 2021 as either a standalone sale or through a plan, and had the Debtors had received any other bids, there would have been an auction for the sale of the Debtors' assets on March 8, 2021. Despite significant interest in the Debtors' assets, the Debtors did not receive any bids for the Debtors' assets, other than from CrowdOut. CrowdOut elected to pursue its purchase of the Debtors' assets as a sale pursuant to Section 363 of the Bankruptcy Code.

All creditors and parties in interest are advised to review the Asset Purchase Agreement, a copy of which is attached as an Exhibit to Docket No. 404.

### 2.04    The Sale of Substantially All of the Debtors' Assets

Consistent with the Sale Procedures Order, on February 19, 2021, the Debtors filed and served upon each counterparty to an executory contract or lease a notice, including the cure amounts due in connection with executory contracts or leases [Docket No. 322] (the "Cure

Notice"). Prior to the hearing to consider the sale of substantially all of the Debtors' assets to CrowdOut or its designee, the Debtors received a number of formal and informal comments, and on or prior to March 3, 2021, the Debtors received five objections to the cure amounts.by nondebtor parties to executory contracts or leases. Additionally, the Debtors received informal comments from a party claiming a contractor or materialman's lien on one of the Debtors' locations, and a limited objection from Sortis [Docket No. 380] (the "Sortis Limited Objection"), asserting that it is entitled to a secured claim from the proceeds of the sale of the Debtors' assets.

At the hearing on March 10, 2021, to consider the Sale Motion to sell the Debtors' assets free and clear of all claims, liens, and encumbrances and the Sortis Limited Objection, Sortis' Limited Objection was sustained by the Court but was resolved by the inclusion of certain provisions of the Sale Order that were consistent with the Court's ruling on the Sortis Limited Objection, and the Court reserved until the hearing to consider confirmation of the Plan the parties' rights with respect to the whether the proceeds of the sale constitute Sortis' collateral. In the event that Sortis successfully asserts that it has a claim that is secured by the proceeds of the sale, it may affect the amount of money available from the GUC Trust available to make distributions on account of Class 5 and 6 Claims.

The Debtors, together with the Committee, CrowdOut and Sortis, reached agreement upon a proposed form of order consistent with the Court's ruling at the March 10, 2021 hearing, and on March 16, 2021, the Court entered an Order approving the sale [Docket No. 409] (the "Sale Order"). On March 18, 2021, the Sale to the Purchaser closed.

Consistent with the Sale Order, between March 3, and April 20, 2021, the Debtors filed a series of notices with respect to contracts to be designated for potential assumption and assignment to the Purchaser and for contracts to be assumed and assigned to the Purchaser and prior to April 20, 2021 [Docket Nos. 359, 362, 373, 382, and 485]. As of April 20, 2021, all but one of the leases have been assumed and assigned to the Purchaser.[9] Additionally, a significant portion of the designated executory contracts were assumed and assigned to the Purchaser.

### 2.05   Sale of Brandco's Interest in Nondebtor Affiliates

On March 25, 2021, the Debtors filed a motion to approve a settlement with Sortis and for approval of a private sale of certain of Brandco's interest in nondebtor Affiliates to Sortis [Docket No. 441] (the "Private Sale Motion"). Among other things, the Private Sale Motion sought approval of an agreement by and through which (i) Brandco agreed to sell to Sortis or its designee Brandco's interests in substantially all of the nondebtor Affiliates, including the rights to three nondebtor Affiliates that the Purchaser had the option to take (if the Purchaser did not elect to take those nondebtor Affiliates) free and clear of claims and interests in the Assets pursuant to 11 U.S.C. § 363(f), (ii) Sortis waived all claims it held against the Debtors' estates, and all of Sortis' proofs of claim filed in the Chapter 11 Cases were deemed withdrawn without need for further order of the Court, (iii) Sortis agreed to pay $20,000.00 to the Debtors; (iv) all of the claims and liens of Sortis as against the nondebtor affiliates not taken by Sortis or its designee were not released and were expressly reserved and preserved, and (v) each of the nondebtor Affiliates purchased by Sortis or its designee agreed to waive all intercompany claims, and the Debtors agreed to waive all intercompany claims against each of the nondebtor Affiliates purchased by Sortis or its designee. No releases were provided to Sortis in the Private Sale Motion.

---

[9]   The deadline for that one lease has, by agreement with the non-debtor party, been extended through April 28, 2021.

On March 31, 2021, the Bankruptcy Court entered an Order approving the Private Sale Motion [Docket No. 461], and on March 31, 2021, the private sale to Sortis' designee closed. After the approval of the Private Sale Motion and subsequent closing, all Sortis Claims against the Debtors, including but not limited to all Claims in Class 1 of the Plan have been waived and released.

### 2.06    Schedules and Statements of Financial Affairs and Bar Date Motion

On January 21, 2021, the Debtors filed their Schedules and Statements of Financial Affairs. As set forth therein, the total amount of claims on the Petition Date was approximately $73,200,000, not including duplicates.  That including secured claims of approximately $22,000,000, priority claims of approximately $800,000,[10] general unsecured claims against the estates, totaling approximately $19,100,000, and intercompany claims of approximately $31,250,000.

The Debtors expect that a significant portion of those claims will be paid and/or otherwise assumed by the Purchaser.

On February 12, 2020, the Debtors filed a motion to establish a bar date of approximately April 5, 2021 for filing of claims, including claims arising under Section 503(b)(9), and a separate bar date of June 29, 2021, for governmental authorities [Docket No. 288].

## ARTICLE III.
## CONFIRMATION PROCEDURES

### 3.01    Confirmation Procedures

On March 18, 2021, the Court entered the Solicitation Procedures Order [Docket No. 422]. Among other things, the Solicitation Procedures Order, approved the adequacy of disclosures in the Plan on an interim basis and set certain deadlines for the solicitation of the Plan, voting on the Plan, filing objections to the Plan and a hearing to consider approval of the Plan.  The Confirmation Hearing has been scheduled for **April 28, 2021 at 10:00 a.m.** (prevailing eastern time) at the Bankruptcy Court[11] to consider (a) final approval of the Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice with the Bankruptcy Court.

### 3.02    Procedure for Objections

Any objection to final approval of the Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or Confirmation of the Plan must be made in writing and Filed with the Bankruptcy Court and served on the following parties so as to be actually

---

[10]   Approximately $185,000 of the scheduled priority claims were due to current and former employees of the Debtors that have since been paid.

[11]   Because of restrictions due to COVID-19, it is currently unclear whether the hearing to consider confirmation will be in person or via Zoom and CourtCall.  One week prior to the hearing to consider confirmation of the Plan, the Debtors' Claims agent will post on the Debtors' website (https://omniagentsolutions.com/pbs) whether the hearing will be in person.

received on or before **April 21, 2020 at 4:00 p.m. (prevailing eastern time)** upon (a) (a) counsel to the Debtors: counsel to the Debtors: Jeffrey R. Waxman, Esquire and Eric J. Monzo Esquire at jwaxman@morrisjames.com and emonzo@morrisjames.com**,** respectively   (b) counsel to the Committee, Warren Martin, Esquire and Kelly Curtin, Esquire at wjmartin@pbnlaw.com and kdcurtin@pbnlaw.com**,** respectively; and (c) counsel to the Office of the United States Trustee, Timothy Fox, Jr., Esquire at timothy.fox@usdoj.gov.   Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### 3.03    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

### 3.04    Classification of Claims and Equity Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date. The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan and the RSA, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such

reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

### 3.05   Impaired Claims or Equity Interests

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan. Further, only Holders of Claims in Classes 3, 4, and 5 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of

Claims in Class 5 and Holders of Interests in Classes 6, 7, 8, and 9 are Impaired and will not receive or retain any property under the Plan on account of such Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan. Under the Plan,

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 4 (PREPETITION LENDER SECURED CLAIMS), CLASS 5 (GENERAL UNSECURED CLAIMS), CLASS 6 (CONVENIENCE CLASS CLAIMS).

### 3.06    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims and Interests in Classes 7, 8, 9, and 10 are deemed to reject the Plan, the Debtors will seek Confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those in Classes 5 and 6, respectively, will receive or retain any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a) <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b) <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) <u>Equity Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan. As discussed above, the Debtors believe that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

### 3.07    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtors or any successor to the debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the Debtors' Assets have principally been liquidated and the Plan provides for the distribution of the Cash proceeds, if any, of the Debtors' Assets to Holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the GUC Trustee and the Plan Administrator to meet their obligations under the Plan. Based on the Debtors' analysis, the GUC Trustee and the Plan Administrator will have sufficient assets to accomplish their respective tasks under the Plan. Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 3.08    Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code. To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtors' unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such

impaired class. See Liquidation Analysis attached as Exhibit A to this Combined Disclosure Statement and Plan.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in chapter 7.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. Additionally, certain of the costs in connection with the wind-down of the Debtors' estates are being borne by the Plan Administrator, which is being funded by the Purchaser in accordance with the Asset Purchase Agreement.  If these Chapter 11 cases were converted to Chapter 7, the Chapter 7 Trustee would be responsible for those wind-down costs, thereby further reducing the amount available for creditors.   Further, in the event of liquidation, the Estates would still be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals) that are allowed in the chapter 7 case. The Debtors therefore believe that the amount of the expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors would be significantly increased.  Conversion also would likely delay the liquidation process and ultimately distribution of whatever value remains in the Estates.

Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Case was converted to a chapter 7 case, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

### 3.09    Acceptance of the Plan

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must actually vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE VOTING AGENT AT 866-205-3149 OR YOU CAN GO TO THE DEBTORS' WEBSITE AT HTTPS://OMNIAGENTSOLUTIONS.COM/PBS.    THE VOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

## ARTICLE IV.

## CLASSIFICATION OF CLAIMS AND INTERESTS AND EXPECTED RECOVERIES

### 4.01    Overview of Classification.

Pursuant to section 1122 of the Bankruptcy Code, a Claim or Equity Interest is placed in a particular Class for purposes of voting on the Plan and receiving Distributions under the Plan only to the extent (i) the Claim or Equity Interest qualifies within the description of that Class; and (ii) the Claim or Equity Interest has not been paid, released, or otherwise compromised before the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims are not classified under the Plan and are excluded from the following Classes.

### 4.02    Identification and Treatment of Unclassified Claims

(a)    <u>DIP Claims.</u> All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the aggregate amount of the DIP Obligations (as defined in the Final DIP Order), including (i) the principal amount outstanding under the DIP Facility on such date; (ii) all interest accrued and unpaid thereon through and including the date of payment; and (iii) all accrued fees, expenses, and indemnification obligations payable under the DIP Documents. On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed DIP Claim, each holder of an Allowed DIP Claim shall receive (i) the indefeasible payment in cash in full from the proceeds of the closing of any Sale or (ii) in the event DIP Lender is the successful bidder, the assumption of the DIP Obligations by the Purchaser.

(b)    <u>Administrative Claims</u>. On the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim: (a) Cash equal to the amount of such Allowed Administrative Claim; (b) the assumption of the Allowed Administrative Claims by either the Purchaser or the Supporting Lender, in its sole discretion; or (c) such other treatment as to which the Debtors, the Supporting Lender, or the Plan Administrator, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.  The Plan Administrator will provide notice to the GUC Trustee of such objection and/or settlement if the proposed treatment will impact the GUC Trust or result in General Unsecured Claims.

(i) <u>Administrative Claim Bar Date</u>. Holders of Administrative Claims accruing from the Petition Date through the Effective Date, other than Professional Fee Claims, shall File with the Claims Agent and serve on the Plan Administrator and the Supporting Lender requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to actually be received on or before the Administrative Claim Bar Date. Any such Claim not Filed by the Administrative Claim Bar Date shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of Effective Date to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Administrative Claim Bar Date and

45

shall constitute good and adequate notice of such Bar Date. The Plan Administrator shall have one hundred and eighty (180) days (or such longer period as may be allowed by order of the Bankruptcy Court on motion of the Plan Administrator) following the Administrative Claim Bar Date to review and object to Administrative Claims.

(ii) <u>Bar Date for Applications for Professional Fees</u>. Professional Fee Claims are Administrative Claims and all applications for allowance and payment of Professional Fee Claims shall be Filed with the Bankruptcy Court on or before the Professional Fee Bar Date. If an application for a Professional Fee Claim is not Filed by the Professional Fee Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of Effective Date to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Professional Fee Bar Date and shall constitute notice of such Bar Date.

(iii) <u>Section 503(b)(9) Claims</u>. For the avoidance of doubt, (i) the deadline for Filing requests for payment of 503(b)(9) Claims was the General Bar Date and (ii) the deadline for Filing requests for payment of Administrative Claims that arose between the Petition Date through and the Effective Date is the Administrative Claim Bar Date, and neither deadline is extended by Plan nor the Confirmation Order.

(c)    <u>U.S. Trustee Fees</u>. All U.S. Trustee Fees incurred as a result of disbursements made on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on the Effective Date. After the Effective Date, to the extent that the cases are not closed (or dismissed), the Plan Administrator will prepare quarterly financial reports in the format prescribed by the U.S. Trustee, to the extent necessary. To the extent that any payments made after the Effective Date by either the Plan Administrator or GUC Trustee under the Plan are considered disbursements for U.S. Trustee Fee purposes, then any such associated U.S. Trustee Fees shall be paid by either the Plan Administrator or the GUC Trustee as applicable. Notwithstanding anything to the contrary in this Plan, the U.S. Trustee shall not be required to File a proof of Claim for administrative expenses

(d)    <u>Priority Tax Claims</u>. On the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim: (a) Cash equal to the amount of such Allowed Priority Tax Claim; (b) the assumption of the Allowed Priority Tax Claim by either the Purchaser or the Supporting Lender, in its sole discretion; or (c) such other treatment as to which the Debtors or the Plan Administrator, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing. In accordance with the Asset Purchase Agreement, such claims shall be paid by the Plan Administrator. The Plan Administrator will provide notice to the GUC Trustee of such objection and/or settlement if the proposed treatment will impact the GUC Trust or result in General Unsecured Claims.

(e)    <u>Ordinary Course Liabilities</u>. All Ordinary Course Liabilities are deemed to be Allowed Claims to the extent set forth in the Approved Budget. Holders of Administrative Claims on account of Ordinary Course Liabilities are not required to file or serve any request for payment of the Ordinary Course Liability. The Debtors shall continue to pay each Ordinary Course Liability

46

accrued prior to the Effective Date, pursuant to the payment terms and conditions of the particular transaction giving rise to the Ordinary Course Liability, and the Approved Budget.  To the extent that a holder of an Administrative Claim, on account of Ordinary Course Liability which accrued prior to the Effective Date, did not submit an invoice for the Ordinary Course Liability to the Debtors prior to the Effective Date, the holder must submit the invoice to the Reorganized Debtor in the ordinary course of business pursuant to the terms and conditions of the particular transaction giving rise to the Ordinary Course Liability.  The Debtors, Purchaser, or the Supporting Lender, as applicable, shall remit payment on any undisputed Ordinary Course Liability within fifteen (15) days of receipt of the invoice.  The Debtor, Purchaser, or the Supporting Lender, as applicable, shall pay each Ordinary Course Liability accrued after the Effective Date, pursuant to the payment terms and conditions of the particular transaction giving rise to the Ordinary Course Liability. For the avoidance of doubt, the GUC Trust shall have no responsibility for Ordinary Course Liabilities.

### 4.03    Identification of Classes of Claims

(a)    <u>Treatment of Sortis Claims (Class 1)</u>. **Class 1 Sortis Claim is unimpaired and not entitled to vote.** As more fully set forth in Section 2.06 herein, all Sortis Claims have been waived, released and satisfied through the settlement.

(b)    <u>Treatment of Other Secured Claims (Class 2)</u>. **Class 2 Other Secured Claims are unimpaired and not entitled to vote.** Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, its allowed Other Secured Claim, each holder of such Claim shall receive, at the Supporting Lender's election, either (i) cash equal to the full allowed amount of its Other Secured Claim on the later of (x) the Effective Date and (y) the date payment on account of such claim is due, (ii) reinstatement of such Holder's Allowed Other Secured Claim, (iii) the return or abandonment of the collateral securing such Allowed Other Secured Claim to such holder, or (iv) such other treatment as may be agreed to by such Holder and the Supporting Lender. In accordance with the Asset Purchase Agreement, such Claims shall be paid by the Plan Administrator.

(c)    <u>Treatment of Priority Non-Tax Claims (Class 3)</u>. **Class 3 Priority Non-Tax Claims are unimpaired and not entitled to vote.** On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Holder of an Allowed Priority Non-Tax Claim, shall receive, at the Debtors' or Purchaser's election, either (i) payment in full, in cash, of the unpaid portion of its allowed Other Priority Claim or (ii) such other treatment as may be agreed to by such holder and the Supporting Lender. In accordance with the Asset Purchase Agreement, such claims shall be paid by the Plan Administrator.

(d)    <u>Treatment of Prepetition Lender Secured Claims (Class 4)</u>. **Class 4 Prepetition Lender Secured Claims are impaired and entitled to vote.** All the Prepetition Lender Secured Claims have been satisfied by the Purchaser's assumption and shall be deemed waived and released as against the Debtors and their estates as of the Effective Date.

(e)    <u>Treatment of General Unsecured Claims (Class 5)</u>. **Class 5 General Unsecured Claims are impaired and entitled to vote.** The GUC Trust shall receive the GUC Trust Assets on the Effective Date, including the GUC Trust Distributable Cash and the GUC Trust

Participation Funding, and other GUC Trust Assets as applicable. Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of any beneficial interest in the funds remaining in the GUC Trust or such other treatment as may be agreed upon by such Holder and the GUC Trustee, provided, however, that in no event shall the GUC Trust Distributable Cash be used for anything other than distribution on account of Class 5 and Class 6 Claims. The GUC Trustee shall make one or more Distributions on account of such Allowed General Unsecured Claims to each Holder of such Allowed General Unsecured Claims on each Distribution Date (or the date on which such Claim becomes an Allowed General Unsecured Claim) on a Pro Rata basis, provided, however, that the GUC Trustee shall have no obligation to make a Distribution to Holders of Allowed General Unsecured Claims where the GUC Trustee determines that to make such a Distribution would prevent the GUC Trustee from having sufficient funds to pay the actual and necessary costs and expenses of the Estates and the GUC Trust, including GUC Trust Expenses.

General Unsecured Claims of more than $2,500 are presumed to be Class 5 Claims but, pursuant to the Solicitation Procedures Order Holders of Class 5 Claims (i.e., General Unsecured Claims of more than $2,500) may elect to be treated as a Class 6 Claim for voting purposes and substantive treatment under the Plan. PLEASE NOTE: such election will affect the treatment of the Claim, as set forth in the Plan, including (i) so long as the Claim is not subject to a pending objection on the Effective Date, it will be Allowed in the reduced amount of $2,500 on the Effective Date, and (ii) the Holder of the Claim will receive a distribution of 5% of the Allowed amount of the Claim as fixed hereunder in full and complete satisfaction on account of such Claim on the Effective Date or as shortly thereafter as it practicable. In the event that a Class 5 Claim that elects to be treated as a Class 6 Claim is the subject of any objection on the Effective Date, the Holder of the Claim will receive a distribution in full and complete satisfaction on account of such Claim once such objection has been resolved. **Any election by a holder of a Class 5 Claim to be treated as a Class 6 Convenience Claim must be made prior to April 19, 2021, and will be irrevocable thereafter.**

(f)    Treatment of Unsecured Convenience Claims (Class 6).    **Class 6 General Unsecured Claims are impaired and entitled to vote.** Convenience Class Claims are unsecured claims in an amount equal to or less than $2,500. Other than those claims that are the subject of an objection on the Effective Date, all Class 6 Claims will be automatically deemed Allowed on the Effective Date in the lesser amount of (i) the greater of the Claim amount, as filed or scheduled, or (ii) $2,500, and Holders of such Claims shall receive a 5% distribution in full and complete satisfaction of such Claims from the Liquidation Trust on the Effective Date or as soon thereafter as practicable. Class 6 Unsecured Convenience Claims are impaired and entitled to vote.

In the event that a Class 6 Claim is the subject of any objection on the Effective Date, the Holder of the Claim will receive a distribution in full and complete satisfaction on account of such Claim on once such objection has been resolved.

(g)    Treatment of Intercompany Claims (Class 7).    **Class 7 Intercompany Claims are impaired and deemed to have voted to reject.** On the Effective Date, all Intercompany Claims shall be deemed canceled, extinguished and of no further force or effect, and the Holders of such claims shall not be entitled to receive or retain any property on account of such Class 7 Intercompany Claims.

(h)    Treatment of Intercompany Interests (Class 8). **Class 8 Intercompany Interests are unimpaired and deemed to have voted to Accept.** On the Effective Date, , and subject to and in accordance with section 6.01 herein, all Intercompany Interests shall remain for the administrative convenience of maintaining the corporate structure of the Debtors as well as for the purpose of conferring standing to the GUC Trustee and the Holders of such Intercompany Interests shall not be entitled to receive or retain any property on account of such Intercompany Interests.

(i)    Treatment of Section 510(b) Claims (Class 9). **Class 9 Section 510(b) Claims are impaired and deemed to have voted to reject.** On the Effective Date, all Class 9 Section 510(b) Claims shall be cancelled, released, discharged, and extinguished.  Holders of Class 9 Section 510(b) Claims shall not receive any distribution on account thereof.

(j)    Treatment of PBS Interests (Class 10). **Class 10 PBS Interests are impaired and deemed to have voted to reject.** On the Effective Date, all PBS Interests shall be cancelled, released, discharged, and extinguished.  Holders of PBS Interests shall not receive any distribution on account of such Interests.

**4.04    Treatment of Classified Classes, Rights to Vote, and Estimated Distributions**

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including the amount of Claims that exist after the claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distributions received by Creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' best estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered). A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is set forth below. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

49

| Class/Designation | Plan Treatment | Status | Estimated Claim Pool /Projected Recovery |
|---|---|---|---|
| Class 1: Sortis Claim | As more fully set forth in Section 2.05 herein, all Sortis Claims have been waived and released. | Unimpaired; **Not entitled to vote;** Deemed to accept Plan | Approx. $0<br><br>Recovery: 100% |
| Class 2: Other Secured Claims | Each Holder of an Allowed Class 2 Claim, at the option of the Supporting Lender , shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 2 Claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Supporting Lender and the Holder of such Secured Claim have agreed upon in writing. | Unimpaired; **Not entitled to vote;** Deemed to accept Plan | Approx. $0<br><br>Recovery: 100% |
| Class 3: Priority Non-Tax Claims | Each Holder of an Allowed Priority Non-Tax Claim at the option of the Debtors or the Purchaser, as applicable, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 2 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtors and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing, however, as set forth in the RSA, the Purchaser or the Supporting Lender, shall have the right to assume all of the scheduled priority Claims, including Priority | Unimpaired; **Not entitled to vote;** Deemed to accept Plan | Approx. $611,000[12]<br><br>Recovery: 100% |

---

[12] The Debtors anticipate that, consistent with the RSA, all or substantially all of the Class 2 Priority Non-Tax Claims will be assumed by the Purchaser.

| | | | |
|---|---|---|---|
| | Non-Tax Claims, in its sole discretion. In accordance with the Asset Purchase Agreement, such claims shall be paid by the Plan Administrator. | | |
| Class 4 Prepetition Lender Secured Claims | Effective on the Effective Date, all of the Prepetition Lender Secured Claims shall be deemed have been satisfied, waived and released as against the Debtors and their estates. | Impaired; **Entitled to vote** | Approx. $0, Estimated Recovery: 0% |
| Class 5: General Unsecured Claims | On the Effective Date, the GUC Trust shall receive the GUC Trust Assets, including the GUC Trust Amounts. Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of any beneficial interest in the funds remaining in the GUC Trust or such other treatment as may be agreed upon by such Holder and the GUC Trustee, provided, however, that in no event shall the GUC Trust Distributable Cash be used for anything other than distribution to Class 5 and Class 6 claimants. The GUC Trustee shall make one or more Distributions on account of such Allowed General Unsecured Claims to each Holder of such Allowed General Unsecured Claim on each Distribution Date (or the date on which such Claim becomes an Allowed General Unsecured Claim) on a Pro Rata basis, provided, however, that the GUC Trustee shall have no obligation to make a Distribution to Holders of Allowed General Unsecured Claims where the GUC Trustee determines that to | Impaired; **Entitled to vote** | Approx. $14,500,000[13] Estimated Recovery: 3-6% |

---

[13]   Prior to the closing of the sale to the Purchaser, the total amount general unsecured claims was approximately $19,100,000. The Debtors anticipate that a significant number of Class 5 General Unsecured Claims, including all or substantially all of the leases of the Operating Entities, will be assumed by the Purchaser. The estimate of distributions to be received on account of Class 5 Claims may also be affected by any recovery by the GUC Trustee on account of Retained Causes of Action.

| | | | |
|---|---|---|---|
| | make such a Distribution would prevent the GUC Trustee from having sufficient funds to pay the actual and necessary costs and expenses of the GUC Trust, including GUC Trust Expenses. Note that any Holder of a Class 5 Claim can elect to have its Class 5 Claim treated as a Class 6 Claim, as set forth herein.  NOTE: any Class 5 Claim for which an election to Class 6 is made, will be subject to the limitation that all Convenience Claims are limited to $2,500, and shall receive the distribution as described in Class 5. | | |
| Class 6: Convenience Class of Unsecured Claims | Each Holder of an Allowed Convenience Claim Unsecured Claim shall receive 5% of their Allowed Claim from funds remaining in the GUC Trust.  All Class 5 proofs of claim, including any Class 5 Claims whose Holders elect to participate in Class 6, will be deemed Allowed on the Effective Date, unless the Claim is the subject of an objection on the Effective Date. In the event that a Class 6 Claim, including a Class 5 Claim that elects to be treated as a Class 6 Claim, is the subject of any objection on the Effective Date, the Holder of the Claim will receive a distribution in full and complete satisfaction on account of such Claim on once such objection has been resolved.  That is, those Claims will **not** be subject to objections, and will be Allowed in the amount set forth in the Debtors' Schedules or the proof of Claim, up to a Claim amount of $2,500, would be and satisfied in full by a payment of 5% of the claim, from the GUC | Impaired; **Entitled to vote** | Approx.             $ $381,653.15[14] Recovery: 5% |

---

[14]   This total amount of Convenience Class Claims may change depending upon how many Class 5 Claims elect to be treated as Class 6 Claims.

12844563.v1

| | | | |
|---|---|---|---|
| | Trust as soon after the Effective Date as is practicable. | | |
| Class 7: Intercompany Claims | On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Intercompany Claim, each Intercompany Claim shall be cancelled and released without any distribution. | Impaired; Deemed to reject Plan and **Not entitled to vote** | Approx. $31,248,807 Recovery: N/A |
| Class 8: Intercompany Interests | Intercompany Interests shall be reinstated as of the Effective Date. No distribution shall be made on account of any Intercompany Interests. For the avoidance of doubt, on and after the Effective Date, each Intercompany Interest shall continue to be owned by the Reorganized Debtor the predecessor entity of which owned such Intercompany Interests prior to the Effective Date. | Unimpaired; Deemed to accept the Plan and **Not entitled to vote** | Recovery: 0% |
| Class 9: Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims shall be cancelled, released, discharged, and extinguished.  Holders of Section 510(b) Claims shall not receive any distribution on account thereof.  The Debtors do not currently anticipate that any Section 510(b) Claims exist. | Impaired; Deemed to reject Plan and **Not entitled to vote** | Approx. $0 Recovery: 0% |
| Class 10: PBS Interests | On the Effective Date, all PBS Interests shall be cancelled, released, discharged, and extinguished. Holders of PBS Interests shall not receive any distribution on account of such Interests. | Impaired; Deemed to reject Plan and **Not entitled to vote** | Recovery: 0% |

**4.05   Elimination of Classes for Voting Purposes**

Any Class of Claims or Equity Interests that is not occupied as of the date of the commencement of the Confirmation Hearing shall be deemed deleted from the Plan for purposes

of voting on acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

### 4.06    Controversy Concerning Classification, Impairment or Voting Rights

In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Creditor or Interest Holder under the Plan, whether before or after the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy. Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes (i) the amount of any contingent or unliquidated Claim the fixing or liquidation of, as the case may be, would unduly delay the administration of the Chapter 11 Cases and (ii) any right to payment arising from an equitable remedy for breach of performance.

### 4.07    Insurance

Notwithstanding anything to the contrary herein, unless elected otherwise by the GUC Trustee, if any Allowed Claim is covered by an Insurance Policy, such Claim shall first be paid from proceeds of such Insurance Policy to the extent such proceeds are available, with the balance, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

## ARTICLE V.

## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 5.01    The Plan May Not Be Accepted.

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the Creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

12844563.v1

### 5.02    The Plan May Not Be Confirmed.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation had not been met. Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

### 5.03    Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors intend to request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code, to the extent necessary. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

### 5.04    Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors, including the issue of whether Sortis' security interest attaches to the proceeds, if any, from the sale and the amount received on account of the GUC Trust Litigation Claims.  Additionally, both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

### 5.05    Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular

Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, it would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder. The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 5.06    Failure to Consummate the Plan.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

### 5.07    Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan.

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual Allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors, including with respect to the Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of General Unsecured Claims under the Plan.

**5.08    Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected Objection to a particular Claim is, or is not, identified in this Combined Disclosure Statement and Plan. The GUC Trustee or the Plan Administrator, as applicable, may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Combined Disclosure Statement and Plan identifies such Claims or Objections to Claims.

**5.09    Plan Releases May Not Be Approved.**

There can be no assurance that the releases, as provided in Article IX of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

**5.10    Certain Tax Considerations.**

There are a number of material income tax considerations, risks and uncertainties associated with the plan of liquidation of the Debtor described in this Combined Disclosure Statement and Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VI.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.01    Continued Corporate Existence**

(a)    On the Effective Date or as soon as reasonably practicable thereafter, one new share of BrandCo. (or such other Debtor selected as Reorganized Debtor by CrowdOut and the Committee) common stock will be issued to the Plan Administrator to hold in its capacity as Plan Administrator and as the sole shareholder of BrandCo. (or such other Debtor selected as Reorganized Debtor by CrowdOut and the Committee).  No Intercompany Interests shall be cancelled pursuant to the Plan, and all Intercompany Interests shall be unaffected by the Plan and continue in place following the Effective Date, for the administrative convenience of maintaining the Debtors' existing corporate structure, provided however, that one percent (1%) of the Intercompany Interest of each Reorganized Debtor shall be transferred to the GUC Trust solely for the purpose of conferring exclusive standing upon the GUC Trustee to institute GUC Trust Litigation Claims on behalf of each Reorganized Debtor pursuant to the provisions of the LLC Act.  For the avoidance of doubt, the 1% Intercompany Interest transferred to the GUC Trust pursuant to this Plan shall not confer any voting or other rights to the GUC Trust or the GUC

Trustee other than for the purpose of conferring exclusive derivative standing upon the GUC Trustee as described herein.

(b)     On the Effective Date, each of the Reorganized Debtors shall maintain the applicable Debtors' current corporate form. After the Effective Date, the Plan Administrator may decide to (i) maintain each Reorganized Debtor as a corporation or limited liability company, as applicable, in good standing until such time as all aspects of the Plan pertaining to such Reorganized Debtors have been completed, or (ii) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Reorganized Debtor, merge, dissolve, or otherwise terminate the existence of such Reorganized Debtor and complete the winding down of such Reorganized Debtor without the necessity for any other or further actions to be taken by or on behalf of such dissolving Reorganized Debtor or any other Person or any payments to be made in connection therewith, provided, however, that the Plan Administrator shall give the GUC Trustee forty-five (45) days written notice (the "Termination Notice")of its intentions to merge, dissolve or otherwise terminate the existence of a Reorganized Debtor for the sole purpose of determining whether a GUC Trust Litigation Claim is pending or contemplated, in which event the Plan Administrator shall take no action against such Reorganized Debtor until such Trust Litigation Claim is resolved by the GUC Trust, provided, however, that all costs (including the fees of the Plan Administrator) associated with maintaining the continued corporate existence of any such Reorganized Debtor beyond the forty-five (45) days from the delivery of the Termination Notice shall be borne by the GUC Trustee for any such extended period.

(c)     On and after the Effective Date, pursuant to the Plan, the Plan Administrator shall have the right, but not the obligation, to wind down, sell, and otherwise liquidate any and all remaining Assets.

(d)     As of the Effective Date, the certificate of incorporation, bylaws, articles of organization, certificate of formation, or limited liability company operating agreement, as applicable, of each Debtor shall be deemed amended to the extent necessary to carry out the provisions of the Plan. The entry of the Confirmation Order shall constitute authorization for the Debtors, the Reorganized Debtors, the Plan Administrator, and the GUC Trustee, as applicable, to take or cause to be taken all actions (including, if applicable, corporate actions) necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on, and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation.

(e)     To the extent that it is determined that additional corporate governance or structural changes may be required to confer standing on the GUC Trustee with respect to any Causes of Action, the Plan Administrator will exercise reasonable efforts to cooperate and work with the GUC Trustee to achieve and confer such standing so long as any proposed governance or structural changes requested by the GUC Trustee do not interfere with the Plan Administrator's ability to carry out its own functions and responsibilities.

**6.02    Plan Administrator**

(a)    On and after the Effective Date, the Plan Administrator shall become and serve as the initial Plan Administrator.

(b)    On the Effective Date, the Debtors and each of their Estates shall irrevocably vest in the applicable Reorganized Debtor for purposes of administration, by the Plan Administrator, of all of their respective rights, title, and interest in and to all remaining Assets, other than those GUC Trust Assets, and in accordance with section 1141 of the Bankruptcy Code. Except as specifically provided in the Plan or the Confirmation Order, the remaining Assets shall automatically vest in the applicable Reorganized Debtor free and clear of all Claims, Liens, encumbrances, or interests, and such vesting shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax. The Plan Administrator shall be the exclusive representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code regarding all remaining Assets.

(c)    The Plan Administrator shall have the sole authority and right on behalf of each of the Debtors, the Reorganized Debtors, and their respective Estates, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including to:

        (a)    perform under the terms of the Transition Services Agreement as successor in interest to the Debtors;

        (b)    review, reconcile, compromise, settle, or object to all Claims, other than General Unsecured Claims, and resolve such objections as set forth in the Plan, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules;

        (c)    calculate the amount of Distributions to be made to holders of Allowed Administrative Claims, including Professional Fee Claims and 503(b)(9) Claims, Allowed Secured Claims, Allowed Priority Claims, and Allowed Priority Tax Claims, each in accordance with the Plan, and use Cash to make Distributions in accordance with the Plan where applicable;

        (d)    retain, compensate, and employ professionals and other Persons to represent the Plan Administrator with respect to and in connection with its rights and responsibilities;

        (e)    establish, maintain, and administer all documents and accounts of the Reorganized Debtors as appropriate, which shall be segregated to the extent appropriate in accordance with the Plan;

        (f)    maintain, conserve, supervise, prosecute, collect, settle, and protect the remaining Assets;

        (g)    sell, liquidate, transfer, assign, distribute, abandon, or otherwise dispose of the remaining Assets or any part thereof or any interest therein upon such

terms as the Plan Administrator determines to be necessary, appropriate, or desirable in its sole discretion;

(h)    invest Cash of the Reorganized Debtors and the Estates, including any Cash realized from the liquidation of the remaining Assets;

(i)    pay the Plan Administrator Expenses funded by the Supporting Lender;

(j)    wind down of the remaining affairs of the Debtors;

(k)    prepare and file any and all informational returns, reports, statements, returns, and other documents or disclosures relating to the Debtors or the Reorganized Debtors that are required under the Plan, by any governmental unit, or by applicable law;

(l)    take such actions as are necessary or appropriate to close or dismiss any or all of the Chapter 11 Cases, comply with the Plan, exercise the Plan Administrator's rights, and perform the Plan Administrator's obligations;

(m)    exercise such other powers as deemed by the Plan Administrator to be necessary and proper to implement the provisions of the Plan;

(n)    execute any and all documents and instruments necessary to effectuate the provisions of the Plan;

(o)    amend any Reorganized Debtor's organizational documents and dissolve the Reorganized Debtors under applicable state law; and

(p)    to the extent necessary to give full effect to its exclusive administrative rights and duties under the Plan, and subject to Section 6.01 hereof, the Plan Administrator shall be deemed to be vested with all rights, powers, privileges, and authorities of (i) a board of directors or an appropriate corporate officer of each of the Reorganized Debtors under any applicable non-bankruptcy law and (ii) a "trustee" of each of the Reorganized Debtors under sections 704 and 1106 of the Bankruptcy Code.

(d)    Tax Reporting.

(a)    The Plan Administrator shall file any and all tax returns for the Reorganized Debtors and the Estates, as applicable, provided however, the Plan Administrator shall have no personal liability for the signing or accuracy of the Debtors' or Reorganized Debtors' tax returns that are due to be filed after the Effective Date or for any tax liability related thereto.

(b)    The Plan Administrator shall be responsible for payment, out of the remaining Assets, of any taxes imposed on the Reorganized Debtors or the Remaining Assets.

    (c)      The Plan Administrator shall distribute such tax-related notices to the applicable holders of Allowed Claims as the Plan Administrator determines are necessary or desirable.

    (e)      Disbursing Agent. The Plan Administrator shall serve as or may select an alternative disbursing agent for all Allowed Claims other than Allowed General Unsecured Claims under the Plan.

    (f)      Removal of the Plan Administrator. The Plan Administrator may be removed for cause, as determined by an order of the Bankruptcy Court pursuant to a regularly noticed motion by a party in interest in the Chapter 11 Cases, provided, however, that the Plan Administrator may be removed by the Supporting Lender for any reason pursuant to notice filed in the Chapter 11 Cases.

    (g)      Resignation of the Plan Administrator. The Plan Administrator may resign by giving not less than thirty (30) calendar days' prior notice thereof in a notice filed in the Chapter 11 Cases.

    (h)      Successor Plan Administrator. In the event the Plan Administrator is removed or resigns, or if the Plan Administrator otherwise vacates the position, a successor Plan Administrator shall be named by the Supporting Lender, with the appointment of such nominee as successor Plan Administrator effective upon filing a notice with the Bankruptcy Court. Any successor Plan Administrator appointed hereunder shall execute an instrument accepting such appointment and shall deliver such acceptance to the Bankruptcy Court. Thereupon, such successor Plan Administrator shall, without any further act, become vested with all the estates, properties, rights, powers, trusts, and duties of the predecessor Plan Administrator with like effect as if originally named herein; provided, however, that a removed or resigning Plan Administrator shall, nevertheless, when requested in writing by the successor Plan Administrator, execute and deliver any reasonable instrument or instruments conveying and transferring to such successor Plan Administrator all the estates, properties, rights, powers, trusts, and duties of such removed or resigning Plan Administrator.

    (i)      Termination of the Plan Administrator. The Plan Administrator's role as Plan Administrator shall be terminated on the date the Plan Administrator has either obtained authority from the Bankruptcy Court for the entry of the Final Decree or has been relieved of further duties pursuant to the Plan and the terms of the Plan Administrator Agreement.

### 6.03    Causes of Action

On the Effective Date, all Released Causes of Action shall be deemed waived, discharged, forgiven, and forever compromised, and all other Causes of Action shall be vested in and retained by the GUC Trust.  Following the Effective Date, except as otherwise expressly provided herein, the GUC Trustee may assert, compromise or dispose of the Causes of Action without further notice to Creditors or Interest Holders or authorization of the Bankruptcy Court.

### 6.04    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens against the property of any Estates will be fully released, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, shall attach to and be enforceable solely against any net proceeds of sales of such assets. For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

### 6.05    Vesting and Sale or Other Disposition of Assets; Representative of the Estate

Except as otherwise provided in this Plan, on the Effective Date, all remaining property of the Debtors' Estates that has not otherwise been sold or transferred to the GUC Trust, shall vest in the Reorganized Debtor, free and clear of all Claims, liens, charges, other encumbrances, Interests or other interests.

### 6.06    Effectuating Documents; Further Transactions

On and after the Effective Date, the Plan Administrator and/or the GUC Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements, documents, organizational documents, corporate resolutions, consents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the transactions contemplated thereby, in each case, in the name of the GUC Trust and/or the Reorganized Debtors, as applicable, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

### 6.07    Deemed Substantive Consolidation

The Plan contemplates and is predicated upon the substantive consolidation of the Estates for voting, confirmation, and Distribution purposes. Accordingly, on the Effective Date, each Claim filed or to be filed against any Debtor shall be deemed filed only against PBS BrandCo, LLC, and shall be deemed a single Claim against and a single obligation of against PBS BrandCo, LLC, for Distribution purposes, which shall be paid from the Plan Administrator Reserve and/or GUC Trust, as applicable, and absent an agreement prior to the Effective Date, any following the Effective Date any Claim against multiple Debtors shall be disallowed as duplicative. This substantive consolidation of the Estates for Distribution purposes means that the specific Debtor against which a creditor Holds or asserts a Claim will have no effect on the distribution (if any) provided to such creditor under the Plan.

The Plan also provides for the deemed substantive consolidation of the Estates for voting purposes, including tabulating votes to accept or reject the Plan. Accordingly, the Debtors will tabulate each Ballot as a vote to accept or reject the Plan as to each Debtor.

Absent the consent of affected creditors, the Debtors will bear the burden at the Confirmation Hearing of establishing a *prima facie* case for the deemed substantive consolidation of their respective Estates. Accordingly, the Debtors will, to the extent necessary, adduce evidence at the Confirmation Hearing to justify the deemed substantive consolidation in accordance with the standards established by applicable case law. Such evidence may include, without limitation, evidence indicating that creditors have dealt with the Debtors as a single, consolidated enterprise, both before and after the Petition Date, the sale of all of the Debtors' assets without allocation pursuant to the Debtors, the Debtors' central management, and the Debtors' prepetition employed an integrated cash management system of bank accounts. Further, efforts to deconsolidate the Debtors' respective assets and liabilities would be burdensome and divert professional resources that are more profitably directed elsewhere, all without meaningfully affecting the distributions to be received under the Plan.

**6.08    Records**

From and after the Closing Date, Purchaser shall promptly provide to Sellers, the GUC Trustee, the Plan Administrator, and their respective Representatives (after reasonable advance written notice from Sellers or the GUC Trustee, as applicable, and during normal business hours) access to (x) in the case of the GUC Trustee, the Purchased Records to the extent they are relevant to the GUC Trust Assets, or necessary for claims reconciliation or pursuit/defense of the GUC Trust Litigation Claims, (y) in the case of any Seller and the GUC Trustee, all Purchased Records and reasonable access to the current employees who commence employment with the Purchaser (or a designee of the Purchaser) (the "Transferred Employees") to the extent such access is necessary in order for Sellers or the GUC Trustee (as applicable) to comply with applicable law or any material contract to which any Seller is a party, for liquidation, winding up, tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and (z) in the case of the Plan Administrator, the Purchased Records to the extent they are necessary for claims reconciliation of Administrative and Priority Claims and winddown of the Estates. Purchaser shall preserve such Purchased Records until the latest of (i) four (4) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or such longer period ordered by the Bankruptcy Court, or (iv) in the case of Purchased Records related to taxes, the expiration of the statute of limitation applicable to such taxes; provided, however, that the Purchaser shall be permitted to destroy such Purchased Records after providing Sellers with at least thirty (30) days prior written notice of its intent to destroy and permitting Sellers, at their sole cost and expense, to take or copy (at Sellers' election) such Purchased Records prior to destruction. Such access shall include access to any information in electronic form to the extent reasonably available. The Purchaser will not charge Seller, the Plan Administrator, or the GUC Trustee for accessing any Purchased Records and reasonable access to Transferred Employees, provided, however, that Sellers, the Plan Administrator, or the GUC Trustee, as applicable, will be solely responsible for any and all costs incurred by or on behalf of Sellers to review and/or copy any such Purchased Records. The Purchaser acknowledges that Sellers have the right to retain copies of all of Records included in the Purchased Assets for periods prior to the Closing Date.

**6.09    Insurance Policies**

(a)    **Insurance Policies Remain In Force.**  Up to and including their policy expiration date(s), any and all Insurance Policies in effect as of the Effective Date shall remain in full force and effect according to their terms and the coverage obligations of the insurers and third party administrators under such Insurance Policies shall continue following the Effective Date (including any obligations to pay, defend and process insured claims).

(b)    **D&O Insurance Policies; Employment Practice Liability Policies; Similar Policies.**  Nothing contained in this Plan shall affect or impair the rights of any non-Debtor insured persons covered under any D&O Insurance Policy, employment practices or similar liability Insurance Policies (including, without limitation, policies for the benefit of the Debtors' directors, officers, employees, members, managers, or similar persons who served in such capacity either before or after the Petition Date).

**6.10    Dissolution of Creditors' Committee**

Upon the Effective Date, Creditors' Committee shall be dissolved and the members of the Creditors' Committee shall be released and discharged from any further authority, duties, responsibilities, and obligations related to, or arising from, the Chapter 11 Cases, except that the Creditors' Committee shall continue to exist and have standing and capacity to prepare and prosecute applications for the payment of fees and reimbursement of expenses incurred by the Creditors' Committee or its respective Professionals.

**6.11    Request for Expedited Determination of Taxes**

The Debtors, the  Reorganized Debtors, the Purchaser, the Plan Administrator, or the GUC Trust, as the case may be, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

**6.12    Transfer of Privilege/No Waiver**

On the Effective Date, all of the Debtors' evidentiary privileges, including the attorney/client privilege, shall be deemed transferred to the Plan Administrator and the GUC Trust. The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief.  Upon such transfer, the Debtors and the Estates shall have no other further rights or obligations with respect thereto, except to cooperate in providing information to the Plan Administrator and/or GUC Trustee as may be required in connection with fixing claims and/or pursing litigation.  Nothing herein shall be deemed a waiver of the Debtors' or the Estates' rights of privilege.

**6.13    Termination of the Claims Agent**

At any time following the Effective Date, the GUC Trustee shall be authorized to terminate the services of the Claims Agent by providing thirty (30) days written notice without need for order of the Bankruptcy Court or any other party.  Following termination, the Claims Agent shall provide the GUC Trustee and the Bankruptcy Court with a copy of the claims register and a copy

of all filed proofs of Claim.  No later than thirty (30) days after its termination, the Claims Agent shall provide the GUC Trustee with a final invoice, for any unpaid fees for post Effective Date services and unless the GUC Trustee has any issues with respect to the Claims Agent's fees or expenses, the GUC Trustee will be authorized to remit payment of the final invoice within fifteen (15) days of receipt.  The Bankruptcy Court will retain jurisdiction to hear any dispute in the event that the GUC Trustee and Claims Agent cannot agree upon the amount of fees and expenses sought by the Claims Agent.

## ARTICLE VII.

## EXECUTORY CONTRACTS

### 7.01    Assumption of Executory Contract(s)

On or prior to February 19, 2021 (the "Assumption Notice Deadline"), the Debtors served a notice of contract assumption (the "Assumption Notice") on all counterparties to all potential Assigned Contracts (the "Assigned Contract List"), which included, among other things, the amounts necessary to cure any defaults arising under each Assigned Contract (the "Cure Payments").

On March 9, 2021, the Debtors filed a series of notices with respect to contracts assumed contracts, and contracts to be designated for potential assumption and assignment to CrowdOut or its designee prior to April 20, 2021 [Docket Nos. 359, 362, 373, and 382].  As more fully set forth in the Third Amended Notice Executory Contracts and Leases to be Assumed and Assigned or Designated to the Successful Bidder, thirteen executory contracts or leases, including six of the Debtors' leases of real property, were assumed and assigned at closing.  Further, the Third Amended Notice Executory Contracts and Leases to be Assumed and Assigned or Designated approximately fifty-six executory contracts or leases were designation be either rejected or assumed and assigned on or prior to April 20, 2021.

No Assigned Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order authorizing the assumption and assignment of such Assigned Contracts or (ii) the Closing Date, as applicable.

### 7.02    Rejection of Executory Contracts and Unexpired Leases

(a)      Except for any Executory Contracts or Unexpired Leases of the Debtors: (i) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been filed and served prior to, and remains pending as of, Confirmation; (iii) that were previously assumed and assigned to the Purchaser; or (iv) that are listed on the Schedule of Assumed Contracts and Unexpired Leases, each Executory Contract and Unexpired Lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  Nothing herein is intended to affect the validity of contracts and leases

65

entered into by the Debtors on or after the Petition Date, or the rights of the Debtors thereunder, which shall remain in full force and effect after the Effective Date in accordance with their terms.

(a)     The Insurance Policies shall <u>not</u> be considered Executory Contracts for purposes of subsection (a), above.  As discussed in section 6.09, the Insurance Policies shall remain in full force and effect following the Effective Date.

### 7.03     Bar Date for Rejection Damages

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Reorganized Debtor, or the GUC Trust unless a Proof of Claim is filed with the Bankruptcy Court by no later than 30 days after the Effective Date.

### 7.04     Pre-Existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such Executory Contracts or Unexpired Leases.  Notwithstanding any applicable non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods or services previously purchased by the contracting Debtors from counterparties to rejected Executory Contracts or Unexpired Leases.

## ARTICLE VIII.

## PROVISIONS GOVERNING RESOLUTION OF <br> <u>CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN</u>

### 8.01     Claim Objections

(a)     **Right to Object to Claims.**  Notwithstanding anything to the contrary herein, notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, except insofar as a Claim is Allowed under the Plan on and after the Effective Date, the GUC Trustee will have the exclusive authority, but not the obligation, to do any of the following with respect to any Class 5, or Class 6 Claims, while the Plan Administrator, and Supporting Lender, as applicable, shall have the exclusive authority, but not the obligation, to do any of the following with respect to the remaining Classes of Claims: (1) file, withdraw or litigate to judgment objections to and requests for estimation of Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.  The GUC Trustee, Reorganized Debtors, the Plan Administrator, and the Supporting Lender, as applicable, shall succeed to any pending objections to Claims filed by the Debtors prior to the Effective Date, and shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim.  Notwithstanding the foregoing, other than

those Convenience Claims for which an objection is pending on the Effective Date, all Convenience Claims shall be allowed as set forth in the Schedules or the Proof of Claim filed by the Holder of the Convenience Claim.  In the event that there is a pending objection to a Convenience Claim on the Effective Date, the GUC Trustee may pursue or settle such objection. Further, to the extent that an objection to a Claim is pending upon the Effective Date, the Plan Administrative and GUC Trustee, as applicable, shall be authorized and have standing to continue to pursue such objections.

(b)     **Claim Objection Deadline.**  Other than Convenience Claims, which shall be allowed if not the subject of an objection on the Effective Date, objections to Claims must be filed with the Bankruptcy Court, and a copy of the objection must be served on the subject Creditor before the expiration of the Claim Objection Deadline; otherwise such Claims shall be deemed Allowed in accordance with section 502 of the Bankruptcy Code.  The objection shall notify the Creditor of the deadline for responding to such objection.

(c)     **Claim Estimation.**  Pursuant to section 502(c) of the Bankruptcy Code, the GUC Trustee may request estimation or liquidation of any Class 5 Disputed Claim that is contingent or unliquidated or any Class 5 Disputed Claim arising from a right to an equitable remedy or breach of performance.

### 8.02   Distribution Provisions

(a)     **Distributions to be Made**.  The GUC Trustee and Plan Administrator shall responsible for remaining distributions as applicable.

(b)     **Distributions on Account of Convenience Claims.** On the Effective Date, as set forth herein, the GUC Trustee shall make a distribution on account of all Convenience Claims, including General Unsecured Claims that elected to be treated as a Convenience Claim. In the event that any objection to a Convenience Claim is pending on the Effective Date, the GUC Trustee shall remit payment in full and complete satisfaction of such Claim(s) once those Claims are Allowed in whole or part.

(c)     **Establishment of Reserves.**   On or after the Effective Date, the GUC Trustee and Plan Administrator may establish and maintain a Reserve for disputed Claims, as applicable.

(d)     **Distribution Record Date.**  As of 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date, the transfer registers for Claims shall be closed.  The GUC Trustee or the Plan Administrator, as applicable, shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make distributions only to those Holders who are Holders of Claims as of 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date.  Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

(e)    **No Liability.**  The GUC Trustee and the Plan Administrator shall only be required to act and make distributions in accordance with the terms of the Plan.  Except on account of gross negligence, fraud, illegality or willful misconduct, the GUC Trustee and/or the Plan Administrator, as applicable, together with his or her attorneys, advisors, and professionals shall have no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for distributions under the Plan to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a distribution is made or who does not otherwise comply with the terms of the Plan.

(f)    **Distributions on Account of Disputed Claims.**  Except as otherwise provided in a Final Order or as agreed by the relevant parties, the GUC Trustee or Plan Administrator, as applicable, shall set appropriate reserves on account of Disputed Claims, Distributions on account of Disputed Claims, if any, that become Allowed, shall be made by the GUC Trustee or the Plan Administrator, as applicable, at such periodic intervals as the GUC Trustee or the Plan Administrator, as applicable, determines to be reasonably prudent.

(g)    **No Distributions Pending Allowance.**  Notwithstanding anything herein to the contrary: (a) no distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the GUC Trustee or the Plan Administrator, as applicable, no distribution shall be made to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed Claims have been resolved by settlement or Final Order.  No Class 6 Claim, including Class 5 Claims that opt into Class 6, may be Disputed Claims, unless they are the subject of an objection on the Effective Date.

(h)    **Distributions in Cash.**  Any required Cash payments to the Holders of Allowed Claims or Interests shall be made by the GUC Trustee or the Plan Administrator: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank, or by wire transfer from a domestic bank, and (b) by first-class mail (or by other equivalent or superior means as determined by the GUC Trustee or the Plan Administrator, as applicable).

(i)    **Timing of Distributions.**  Except as specifically set forth in the Plan, the GUC Trustee and the Plan Administrator may determine, in their respective discretion, the appropriate timing, amount, and cadence for distributions.

(j)    **Unclaimed Distributions.**  Any entity which fails to claim any Cash within 90 days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan, and the GUC Trustee and/or the Plan Administrator, as applicable, shall be authorized to cancel any distribution that is not timely claimed.  Pursuant to section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the GUC Trust or the Plan Administrator Reserve, as applicable, free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules.  Upon forfeiture, the claim of any Creditor or Interest Holder with respect to such funds shall be irrevocably waived and forever barred against the all of the Debtors, the Estates, the Reorganized Debtor, the Plan Administrator, and the GUC Trustee, notwithstanding any federal or state escheat laws to the

contrary, and such Creditor or Interest Holder shall have no claim whatsoever against the any of the foregoing or to any Holder of a Claim to whom distributions are made.

(k) **Delivery of Distributions and Undeliverable Distributions to Holders of Claims.** Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made by the GUC Trustee or Plan Administrator to Holders of record as of the Distribution Record Date, as set forth on the latest date of the following documents: (a) to the address of payment set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed; (b) at the addresses set forth in any written notices of address changes delivered to the Debtors after the date of any related Proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtors have not received a written notice of a change of address prior to the Effective Date.

(l) **Undeliverable Distributions.** The GUC Trustee and the Plan Administrator shall make one attempt to make the distributions contemplated hereunder in accordance with the procedures set forth herein. The GUC Trustee or the Plan Administrator, as applicable, in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable distributions. Any distributions returned to the GUC Trustee or the Plan Administrator as undeliverable or otherwise shall remain in the possession of the GUC Trust or the Plan Administrator Reserve, until such time as a distribution becomes deliverable, and no further distributions shall be made to such Holder unless such Holder notifies the GUC Trustee or the Plan Administrator of its then current address. Any Holder of an Allowed Claim or Interest entitled to a distribution of property under this Plan that does not assert a claim pursuant to the Plan for an undeliverable distribution, or notify the GUC Trustee or the Plan Administrator of such Holder's then current address, within 30 days of such distribution shall have its claim for such undeliverable distribution irrevocably waived and forfeited and shall be forever barred from asserting any such claim against the Debtors, the Estates, the Reorganized Debtor, the Plan Administrator and/or the GUC Trustee or their respective property, and such distribution shall be deemed unclaimed property under Section 8.02(j).

(m) **De Minimis Distributions.** If any interim distribution under the Plan to the Holder of an Allowed Claim would be less than $20.00, the GUC Trustee may withhold such distribution until a final distribution is made to such Holder. If any final distribution under the Plan to the Holder of an Allowed Claim would be less than $20.00, the GUC Trustee may cancel such distribution. Notwithstanding the foregoing, any distribution on account of Class 6 Claim shall not be deemed a de minimis distribution for purposes of this section. Any unclaimed distributions pursuant to this Section shall be treated as unclaimed property under Section 8.02(j) of the Plan.

(n) **Remainder Amounts after final Distribution.** After final Distributions have been made in accordance with the terms of the Plan, if the GUC Trustee has remaining assets on hand, after payment of all GUC Trust fees and expenses, the GUC Trustee may donate such funds to Delaware Pro Se Bankruptcy Foundation. After final Distributions have been made in accordance with the terms of the Plan, if the Plan Administrator has remaining assets on hand, after payment of all Plan Administrator Expenses, the Plan Administrator shall return the remaining funds to the Supporting Lender.

12844563.v1

# ARTICLE IX.

## RELEASES, INJUNCTION, AND RELATED PROVISIONS

### 9.01    Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claim and Interests and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and are fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the liquidating or Reorganized Debtor, the Purchaser, or the GUC Trust, as applicable, may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

### 9.02    Releases by Debtors

**As of the Effective Date, for good and valuable consideration, including the contributions of the Released Parties in facilitating the administration of the Chapter 11 Cases and other actions contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, the Released Parties are deemed forever released and discharged by the Debtors and Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other entity, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan, the Disclosure Statement, or related agreements, instruments or other documents, including any rights or remedies under section 506 of the Bankruptcy Code, other than Claims or liabilities to the extent arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, actual fraud or willful misconduct, as determined by a Final Order.**

### 9.03    Releases by Third Parties

71

On and as of, the Effective Date and for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Released Parties shall be forever released from any and all claims, obligations, actions, suits, rights, debts, accounts, causes of action, remedies, avoidance actions, agreements, promises, damages, judgments, demands, defenses, and liabilities throughout the world under any law or court ruling through the Effective Date (including all claims based on or arising out of facts or circumstances that existed as of or prior to the Effective Date, including claims based on negligence or strict liability, and further including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise) which the Debtors, their Estates, the Reorganized Debtor, Creditors or other persons receiving or who are entitled to receive distributions under the Plan may have against any of them in any way related to the Chapter 11 Cases, the Debtors (or their predecessors), or any of their operations or businesses; provided however that the foregoing release is granted only by the (a) Creditors who are unimpaired, (b) Creditors who returned a Ballot and did not check the opt-out box on the Ballot, and (c) Creditors or potential Creditors (including those who were listed on the Schedules of Assets and Liabilities) who were sent a solicitation package but did not vote and did not return a Ballot with the opt-out box checked; provided further, however that the release provided in this Section shall not apply to any Creditor in category (c) above if the solicitation package was returned to the Debtors as undelivered, and that such Creditor did not otherwise file a Ballot; and provided further, however, that the release provided in this Section shall not extend to any claims by any Governmental Unit with respect to criminal liability under applicable law, willful misconduct or bad faith under applicable law, or ultra vires acts under applicable law.

### 9.04    Exculpation and Limitation of Liability

(a)    The Exculpated Parties will neither have nor incur any liability to any entity for any claims or causes of action arising on or after the Petition Date and prior to closing of the Chapter 11 Cases (and in the event that the Chapter 11 Cases are closed and subsequently reopened, during such time as the Chapter 11 Cases are reopened), for any act taken or omitted to be taken in connection with, or related to (i) the Chapter 11 Cases, (ii) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan, (iii) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, or (iv) the approval of the Disclosure Statement or confirmation or consummation of the Plan; *provided, however*, that the foregoing provisions will have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that the Exculpated Parties will each be entitled to rely upon the advice of counsel concerning their duties pursuant to, or in connection with, the above referenced documents, actions or inactions

(b)    The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distributions pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the

violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**9.05 Injunction**

(a) FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

(b) FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN SECTIONS 9.02 THROUGH 9.04 (INCLUSIVE), THE APPLICABLE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED UNDER THIS PLAN.

(c) EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO THE PLAN OR THAT ARE SUBJECT TO THE EXCULPATORY PROVISIONS OF SECTION 9.03, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, OR SETTLED PURSUANT TO THE PLAN; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

(d) THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND

AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED, AND ALL SUCH CLAIMS AND INTERESTS SHALL BE DEEMED SURRENDERED AND EXTINGUISHED.

(e)     EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED, AND ALL INTERESTS SHALL BE DEEMED SURRENDERED OR EXTINGUISHED, AS THE CASE MAY BE, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(g) OF THE BANKRUPTCY CODE.

(f)     ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

**9.06    Limited Injunction**

UNLESS AGREED IN WRITING OTHERWISE BY THE GUC TRUSTEE, ALL LITIGATION AND/OR ANY CONTINUATION OF LITIGATION TO WHICH ONE OR MORE OF THE DEBTORS ARE A PARTY (TO THE EXTENT NOT RELEASED OR DISCHARGED HEREUNDER), SHALL BE ENJOINED FOR A PERIOD OF SIX (6) MONTHS FOLLOWING THE EFFECTIVE DATE.

## ARTICLE X.

## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

**10.01    Conditions Precedent to Confirmation**

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Section 10.03:

(a)     The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Debtors, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

(b)     The Plan, the Confirmation Order, and documents in the Plan Supplement shall be in a form and substance reasonably acceptable to the Debtors and the Supporting Lender, in consultation with the Creditors' Committee.

(c)     The Restructuring Support Agreement shall not have been terminated or materially breached and shall remain in full force and effect.

**10.02    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Section 10.03.

(a)    The Restructuring Support Agreement shall not have been terminated or breached and shall remain in full force and effect.

(b)    The Transition Services Agreement shall not have been terminated or breached and shall remain in full force and effect.

(c)    The Confirmation Order shall have been entered and the Confirmation Order shall not have been stayed, modified, or vacated on appeal.

(d)    The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Debtors confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(e)    The Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but prior to the Effective Date, shall be consistent with the Restructuring Support Agreement and in form and substance acceptable to the Debtors and the Supporting Lender in all respects

(f)    All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

(g)    No order of a court shall have been entered and remain in effect restraining the Debtors from consummating the Plan and the transactions contemplated therein, and the Confirmation Order shall be in full force and effect.

(h)    The Restated Organizational Documents shall have been filed with the applicable governmental authorities.

(i)    All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and are in form and substance, acceptable to the Debtors.

**10.03    Waiver of Conditions**

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article X may be waived at any time by each of the Debtors, after consultation with the Committee, provided, however, that the conditions set forth in Article X of the Plan may be waive only by mutual written agreement of the Debtors and the Supporting Lender.

**10.04    Effect of Failure of Conditions**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by or Claims against the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors, the Creditors' Committee, any Creditors or Interest Holders or any other entity in any respect.

### 10.05   Filing of Notice of the Effective Date.

On the Effective Date or as shortly thereafter as reasonably practicable, the Debtors shall file a notice of the Effective Date with the Bankruptcy Court.

## ARTICLE XI.

## MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN

### 11.01   Modification and Amendments

Except as otherwise specifically provided herein, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and Bankruptcy Rules and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend or modify materially the Plan with respect to any or all Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; provided, however, that any alterations, amendments or modifications to the Plan, the Disclosure Statement and Confirmation Order must be consistent in all respects with the Settlements. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article and with the consent of both of the Debtors. In addition, prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Allowed Claims or Interests.

### 11.02   Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the commencement of the solicitation of votes on the Plan are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### 11.03   Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan before the Effective Date. If the Debtors revoke or withdraw the Plan, or if the Confirmation Date or the Effective Date does

not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of any Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests or Claims by any Debtor against any other entity; (b) prejudice in any manner the rights of such Debtor, the Creditors' Committee, the Holder of any Claim or Interest or any other entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, the Creditors' Committee or any other entity.

## ARTICLE XII.

## <u>JURISDICTION</u>

### 12.01  Bankruptcy Court Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over the Chapter 11 Case to the maximum extent as is legally permissible, including, without limitation, for the following purposes:

(a)    To allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

(a)    To ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(b)    To determine any and all applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract;

(c)    To consider and approve any modification of the Plan, remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order;

(d)    To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any Plan Documents or any entity's obligations in connection with the Plan or any Plan Documents, or to defend any of the rights, benefits, Estate property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof;

(e)    To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtors, the Estates, the GUC Trustee, or the Reorganized Debtor;

(f)    To decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtors, or the Estates that may be pending on the Effective Date or that may be brought by the Debtors or the Reorganized Debtor, or any other related proceedings by the Reorganized Debtor, and to enter and enforce any default judgment on any of the foregoing;

(g)    To decide or resolve any and all applications for compensation;

(h)    To issue orders in aid of execution and implementation of the Plan or any Plan Documents to the extent authorized by section 1142 of the Bankruptcy Code or provided by the terms of the Plan;

(i)    To decide issues concerning the federal or state tax liability of the Debtors which may arise in connection with the confirmation or consummation of the Plan or any Plan Documents;

(j)    To interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Cases; and

(k)    To enter an order closing the Chapter 11 Cases when all matters contemplating the use of such retained jurisdiction have been resolved and satisfied.

## 12.02    Limitation on Jurisdiction

In no event shall the provisions of the Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334, as well as the applicable circumstances that continue jurisdiction for defense and enforcement of the Plan and Plan Documents.  For the avoidance of doubt, however, such jurisdiction shall be deemed, by the entry of the Confirmation Order, to:

(a)    Permit entry of a final judgment by the Bankruptcy Court in any core proceeding referenced in 28 U.S.C. § 157(b) and to hear and resolve such proceedings in accordance with 28 U.S.C. § 157(c) and any and all related proceedings, including, without limitation, (i) all proceedings concerning disputes with, or Causes of Action or Claims against, any Person that the Debtors, the Estates, or the GUC Trust or any of their successors or assigns, may have, and (ii) any and all Causes of Action or other Claims against any Person for harm to or with respect to (x) any Estate Property, including conversion of Estate Property, or (y) any Estate Property liened or transferred by the Debtors to any other Person;

(b)    Include jurisdiction over the recovery of any Estate Property (or property transferred by the Debtors with Bankruptcy Court approval) from any Person wrongly asserting ownership, possession or control of the same, whether pursuant to sections 542, 543, 549, and/or 550 of the Bankruptcy Code or otherwise, as well as to punish any violation of the automatic stay under section 362 of the Bankruptcy Code or any other legal rights of the Debtors or the Estates under or related to the Bankruptcy Code; and

(c)    Permit the taking of any default judgment against any Person who has submitted himself or herself to the jurisdiction of the Bankruptcy Court.

# ARTICLE XIII.

# MISCELLANEOUS

## 13.01   Exemption from Taxes

(a)     The Plan and the Confirmation Order provide for (a) the issuance, transfer or exchange of notes, debt instruments and equity securities under or in connection with the Plan; and (b) the creation, execution and delivery of agreements or other documents creating or evidencing the formation of the GUC Trust and any right or interest in the GUC Trust.  Pursuant to section 1146 of the Bankruptcy Code and the Plan, any such act described or contemplated herein will not be subject to any stamp tax, transfer tax, filing or recording tax, or other similar tax.  Further, the sale of substantially all of the Debtors' assets to the Purchaser was in clear contemplation of the Plan, and pursuant to section 1146 of the Bankruptcy Code and the Plan, any such act described or contemplated therein will not be subject to any stamp tax, transfer tax, filing or recording tax, or other similar tax.

## 13.02   Compliance with Tax Requirements

Notwithstanding anything to the contrary in this Plan, the Reorganized Debtor shall be entitled to deduct any federal, state or local withholding taxes from any distributions made with respect to Allowed Claims, as appropriate.  The Reorganized Debtor shall be authorized to take all actions necessary to comply with applicable withholding and reporting requirements, including, without limitation, applying a portion of any distribution of Cash to be made under the Plan to pay applicable withholding Taxes.  Any amounts withheld pursuant to the immediately preceding sentence will be deemed to have been distributed and received by the applicable recipient for all purposes of the Plan.  Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a distribution under the Plan shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any Governmental Unit, including income, withholding and other tax obligation, on account of such distribution.  The GUC Trustee and the Plan Administrator shall have the right, but not the obligation, to not make a distribution until the applicable recipient has made arrangements satisfactory to the GUC Trustee or the Plan Administrator, as applicable, for the payment of any Tax obligations.  For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such distributions, if any, will apply to any interest on such Claim after the Petition Date.  The GUC Trustee and the Plan Administrator shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8, or any other tax form, documentation or certification as may be requested by the GUC Trustee or the Plan Administrator, as applicable, as a condition precedent to being sent a distribution.  If a Holder of an Allowed Claim does not provide the GUC Trustee or the Plan Administrator, as applicable, with an executed Form W-9, Form W-8 or other requested tax form within 90 days after the date of the GUC Trustee or the Plan Administrator's initial request, the GUC Trustee or the Plan Administrator may, in its sole respective discretion (a) make such distribution net of applicable withholding or (b) reserve such distribution, in which case (i) such Holder shall be deemed to have forfeited the right to receive any distribution under the Plan, (ii) any such distribution shall revert to the source of such distribution (*i.e.,* the GUC Trustee or the

Distribution Reserve), for distribution on account of other Allowed Claims and (iii) the Claim of the Holder originally entitled to such distribution shall be irrevocably waived and forever barred without further order of the Bankruptcy Court. The GUC Trustee and the Plan Administrator reserve the right to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

### 13.03   Defenses and Setoff

Nothing contained in this Plan shall constitute a waiver or release by the Debtors, their estates, the Reorganized Debtor, the Plan Administrator, or the GUC Trustee of any right rights in respect of legal and equitable objections, defenses, setoffs, or recoupment. To the extent permitted by applicable law, the GUC Trustee and/or the Plan Administrator may, but shall not be required to, set off or recoup against any Claim and the payments or other distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Debtors, the Estates, the Reorganized Debtors, the Plan Administrator or the GUC Trustee may have against the Holder of such Claim or Interest. The Plan Administrator may, but shall not be required to offset claims that arose after the Petition Date of any nature whatsoever that the Debtors, the Estates, the Reorganized Debtors, or the Plan Administrator may have against the Holder of an Administrative Claim, to the extent permitted by applicable law, against any Administrative Claim.

### 13.04   Governing Law

Except to the extent the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

### 13.05   Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan or any Plan Document shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### 13.06   Transfer of Claims and Equity Interests

Any transfer of a Claim shall be in accordance with Bankruptcy Rule 3001(e) and the terms of this Section. Notice of any such transfer shall be forwarded to counsel for the Debtors and the GUC Trustee. Both the transferee and transferor shall execute any notice, and the signatures of the parties shall be acknowledged before a notary public. The notice must clearly describe the interest in the Claim to be transferred. No transfer of a partial interest shall be allowed. All transfers must be of one hundred percent (100%) of the transferor's interest in the Claim.

### 13.07   Post-Effective Date Service List

Pursuant to Bankruptcy Rule 2002 and any applicable Local Rule, notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served

upon counsel for the U.S. Trustee, counsel to the Debtors, counsel for the GUC Trustee, and all persons on the Bankruptcy Rule 2002 service list.  With the exception of the Debtors and the U.S. Trustee, any Person desiring to remain on the Debtors' Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the GUC Trustee within thirty (30) days subsequent to the Effective Date.  Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order.  **Persons who do not file a request for continued service within thirty (30) days subsequent to the Effective Date shall be removed from the Debtors' Bankruptcy Rule 2002 service list.**

### 13.08   Notices

To be effective, any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors, the Creditors' Committee, and the U.S. Trustee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

**(a)**      **If to the Debtors**

jwaxman@morrisjames.com
emonzo@morrisjames.com

**(b)**      **If to the Creditors' Committee or the GUC Trustee**

Porzio Bromberg & Newman, P.C.
wjmartin@pbnlaw.com
raparisi@pbnlaw.com

**(c)**      **If to the Purchaser**

Norton Rose Fulbright (US) LLP
greg.wilkes@nortonrosefulbright.com

**-and-**

Womble Bond Dickinson (US) LLP
morgan.patterson@wbd-us.com

**-and-**

**(d)**      **If to the U.S. Trustee:**

Office of the U.S. Trustee
timothy.fox@usdoj.gov

12844563.v1

### 13.09   Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) and 7062 and/or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtor, any and all Holders of Claims and Interests (irrespective of whether such Claims or Interests are Allowed or Disallowed or were voted to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with one or more of the Debtors.

### 13.10   Severability of Plan Provisions

If, before the Effective Date of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted so long as such term or provision is acceptable to the Debtors.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (iii) non-severable and mutually dependent.

### 13.11   Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan, to the extent not inconsistent with the Plan.  The Debtors reserve the right to amend the Exhibits and schedules to the Plan any time prior to Confirmation.

### 13.12   Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e), the Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code, including, if applicable, in the offer, issuance, sale and purchase of any Plan securities (if any) provided under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

### 13.13   Conflicts

If there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document, as applicable, shall govern and control.  If any provision of this Plan (including a Plan Supplement) conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

### 13.14   U.S. Trustee Fees

<u>U.S. Trustee Fees</u>. All U.S. Trustee Fees incurred as a result of disbursements made on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on the Effective Date.  After the Effective Date, to the extent that the cases are not closed (or dismissed), the Plan Administrator will prepare quarterly financial reports in the format prescribed by the U.S. Trustee, to the extent necessary.  To the extent that any payments made after the Effective Date by either the Plan Administrator or GUC Trustee under the Plan are considered disbursements for U.S. Trustee Fee purposes, then any such associated U.S. Trustee Fees shall be paid by either the Plan Administrator or the GUC Trustee as applicable. Notwithstanding anything to the contrary in this Plan, the U.S. Trustee shall not be required to File a proof of Claim for administrative expenses.

### 13.15   Implementation

The Debtors shall be authorized to perform all reasonable, necessary and authorized acts to consummate the terms and conditions of the Plan and the Plan Documents, without further order from the Bankruptcy Court.

### 13.16   No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtors, the Estates, or the Creditors' Committee with respect to any matter set forth herein, including, without limitation, liability on any Claim or Equity Interest or the propriety of the classification of any Claim or Equity Interest.

12844563.v1

# ARTICLE XIV.

## RECOMMENDATION

In the opinion of the Debtors, the Plan is superior and preferable to the alternatives described herein. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and Support Confirmation.

Dated:  April 27, 2021

**MORRIS JAMES LLP**

/s/ *Jeffrey R. Waxman*
Jeffrey R. Waxman (No. 4159)
Eric J. Monzo (No. 5214)
Brya M. Keilson (No. 4643)
Sarah M. Ennis (No. 5745)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Email: jwaxman@morrisjames.com
Email: emonzo@morrisjames.com
Email: bkeilson@morrisjames.com
Email: sennis@morrisjames.com

*Counsel to the Debtors and Debtors in Possession*

84